Robert G. HOMAN, Appellant,

v.

Devinder GOYAL, Appellee.

No. 96–CV–219.

District of Columbia Court of Appeals.

Argued Nov. 13, 1997.

Decided April 23, 1998.

John T. Riely, Washington, DC, for appellant.

Frederic W. Schwartz, Jr., Washington, DC, for appellee.

Before STEADMAN, SCHWELB, and RUIZ, Associate Judges.

SCHWELB, Associate Judge.

A jury awarded Robert G. Homan $40,000 against Devinder Goyal as compensatory damages for intentional infliction of emotional distress. On January 18, 1996, in a written order, the trial judge granted Goyal's motion for judgment notwithstanding the verdict (JNOV). On appeal, Homan contends that there was sufficient evidence to support the jury's verdict. We agree with Homan. Accordingly, we reverse.

## I.

### THE TRIAL COURT PROCEEDINGS

. This is the kind of case that could persuade the cynical reader who believes he has seen it all that something new and different may still be lurking around the corner.

### A. *The Plaintiff's case.*

#### (1) *Robert Homan's testimony.*

Prior to January 1993, Robert Homan, a Senior Evaluator at the General Accounting Office, had never heard of Gabriel DaSilva or Devinder Goyal. Beginning at about 1 a.m. on Tuesday, January 12 of that year, however, Homan received a series of telephone calls from a man who identified himself as Gabriel DaSilva. The caller claimed on each occasion that Homan had DaSilva's wife, Irene, and demanded to speak to Irene. Homan repeatedly explained to the caller that he had the wrong number and that Homan did not know Irene. Homan eventually hung up, but DaSilva continued to call back, sometimes as often as twenty times a night. Homan reported the bizarre calls to the police, and an officer spoke to the caller. Nevertheless, DaSilva was undeterred and continued to call for several days. According to Homan, the calls became progressively more hostile.

During the course of these conversations, Homan asked DaSilva where he had obtained Homan's telephone number. DaSilva revealed that he had received the number from a certified public accountant named Devinder Goyal. DaSilva insisted that he knew he had the right number because Goyal had given it to him.

On January 13, 1993, following DaSilva's disclosure of the source of his purported information, Homan telephoned Goyal at Goyal's office. Homan told Goyal about the bizarre calls that he had been receiving from DaSilva. Goyal explained to Homan that DaSilva's wife, Irene DaSilva, had briefly been employed by Goyal. According to Goyal, DaSilva had been beating his wife, and Mrs. DaSilva had left her husband. Goyal told Homan that for the year or so following Mrs. DaSilva's departure, Gabriel DaSilva

had been "on the warpath" in search of his wife and harassing Goyal regarding the wife's whereabouts. In fact, Goyal later told Homan that DaSilva had called Goyal at his office "maybe twenty times a day for the last year," and had made it difficult for Goyal to run his business. Homan told Goyal his (Homan's) telephone number, and Goyal confirmed that this was the number that he (Goyal) had given to DaSilva. Homan asked Goyal where Goyal had obtained Homan's number, and Goyal responded that he had received it from a friend called Paul. Goyal agreed to tell DaSilva that Homan's number was the wrong number, and Homan hoped that this information would deter DaSilva from continuing his contacts with Homan.

Homan testified, however, that the telephone calls did not stop in the wake of his initial conversation with Goyal. Instead, they continued unabated during the weekend of January 16–17. Homan testified that he spoke with Goyal again on Thursday, January 21, and that

> again I asked him would you please speak to Gabriel again and he said that he would and I was a little frustrated at that point. I said, frankly I don't know why you would give a telephone number to any man who used to beat up his wife and say here's your ex-wife, and [Goyal] had no response and that was the end of the conversation.

Meanwhile, Homan contacted the telephone company, which traced the unwelcome calls to DaSilva. According to Homan, the company apparently sent a registered letter to DaSilva threatening to cut off DaSilva's telephone service. As a result, the calls from DaSilva stopped for approximately a week, and Homan believed that the problem had finally been resolved. Once again, he was wrong.

On January 25, 1993, shortly after Homan returned home from work, he received a "beep" from DaSilva (apparently on the apartment house intercom). DaSilva disclosed that he was downstairs in front of Homan's building. As he had done in the past, DaSilva demanded to see his wife, Irene.

Homan decided to go downstairs to "try and talk some sense into this guy." He spoke with DaSilva in the lobby. DaSilva was in possession of a yellow "post-it" note with Homan's address on it.[1] Homan and a neighbor attempted to assure DaSilva that Homan did not know Mrs. DaSilva and that "there haven't been any Indian women going in and out of my apartment," but DaSilva demanded to go into the apartment to see for himself. Homan declined to admit DaSilva to Homan's apartment. DaSilva pursued Homan to the apartment, which was on the fifth floor. Homan locked the door, and Da-Silva banged on the door with considerable ferocity for about twenty minutes. Homan called the police, but by the time officers arrived, DaSilva had left.

Homan testified that an hour or so after the personal encounter between the two men, DaSilva telephoned once again. On this occasion, DaSilva "said very distinctly five times I'm going to kill you." Homan hung up. DaSilva later repeated the death threat in a subsequent phone call; this time, Homan's friend, Daniel McGoldrick, was listening on another extension.[2] Fearing for his life, Homan left his apartment and moved in with McGoldrick and McGoldrick's wife in their home in Arlington, Virginia for approximately one month. Homan also obtained an unlisted number for his own apartment.

In the wake of this escalation of DaSilva's harassment, Homan believed that he "needed to get some information was this a credible threat." He testified that he called Goyal a dozen times, and that he advised Goyal's secretary that Gabriel DaSilva had showed up at Homan's home and had threatened to kill Homan. According to Homan, however, Goyal would not take his calls.[3]

In response to a question as to how these events affected him, Homan testified:

1. Homan testified that he had never given either his last name or his address either to DaSilva or to Goyal.

2. Homan had gone to the police station earlier to report DaSilva's threats. He was told that his case would receive higher priority if he had a witness.

3. Goyal testified that he did not have a number at which to call Homan. An impartial jury that

Well, I mean this turned my life upside down. I had no idea what was happening to me. I wasn't living in my own home. I didn't know if I could go back home. I didn't know how this was going to end. The one person that could provide information for me refused to talk to me. It appeared as if I had been singled out for some unknown reason. A crazy person had been sicked after me and I couldn't explain why.

I had to explain to all my friends and family why I had to get an unlisted number. I had to explain to my employers why I was missing work. I had to miss work to go look for a new place to live, and it was really hard to focus on my work. Every time I would leave the apartment— well, I moved home after about a month, but every time I would walk around the street I'd wonder, you know, is this guy following me. I had no idea what was going on.

\* \* \* \* \* \*

[H]e kept repeating the same thing, I got this number from Mr. Goyal and it just kept escalating. . . . I mean I never thought that he would come to my house, and then when he did that and he threatened to kill me and I said well, if you threaten to kill me maybe he will kill me. I don't know. I didn't know what to do.

(2) *Gabriel DaSilva's testimony.*

DaSilva, an immigrant from India who worked as a chef, was called as a witness for the plaintiff. DaSilva substantially corroborated Homan's testimony. DaSilva explained that his wife had briefly worked for Goyal, and that he (DaSilva) was convinced that she and Goyal were having an affair.[4] DaSilva acknowledged that he had beaten his wife on

credited Homan's testimony, however, could reasonably find, in light of the number and urgency of Homan's calls, that Goyal was deliberately avoiding Homan.

4. This belief was apparently based primarily on the fact that on one Sunday, Mrs. DaSilva had declined to go to church with her husband and told him that she was needed at work.

one occasion, apparently to punish her for her supposed infidelity.

DaSilva related that after his wife left him, he was "crying and just calling [Goyal], where's my wife, where's my wife, you know." He testified that he continued to make these calls every day for almost a year. He also stated that he went to Goyal's office "at least a hundred times."

DaSilva testified that while he was searching for his wife, Goyal had given him many telephone numbers—perhaps seven or eight—of people with whom DaSilva might find her. One of the numbers that Goyal provided to DaSilva was Homan's. According to DaSilva, "I called Homan because Devinder Goyal told me your wife live[s] with Mr. Homan, so because of that I'm calling Homan." DaSilva testified that he telephoned Homan ten or fifteen times, "daytime, nighttime ... when I'm going to work, from home. Sometimes from work."

When DaSilva's calls to Homan proved unproductive, DaSilva went to see Goyal again and asked him for Homan's address. Goyal obtained the address from a book and wrote it down for DaSilva on a small piece of paper. DaSilva testified that he proceeded to Homan's apartment house, spoke with Homan in person, followed Homan to the apartment, and banged on the door. DaSilva confirmed that he telephoned Homan later that night. Although DaSilva did not acknowledge making a specific death threat, he testified that "I said I'll fix you this and that. I didn't know what I said because I'm angry, you know."

DaSilva also testified that, on one occasion, he came to Goyal's office, grabbed Goyal's lapels, and pushed him against the wall. He stated that this encounter took place after his visit to Homan's apartment house. He also disclosed, however, that it was after his physical encounter with Goyal that Goyal gave

him a telephone number which DaSilva subsequently pursued.[5]

### (3) Detective Rivera's testimony.

Detective Albert Rivera of the Metropolitan Police Department, who investigated Homan's complaint that DaSilva had threatened to kill him, testified that he had interviewed Goyal on January 29, 1993 in relation to that investigation. According to Rivera, Goyal told him that DaSilva had come to Goyal's Springfield, Virginia office and had threatened to kill Goyal if he (DaSilva) could not locate his wife. Goyal stated that he had considered swearing out a warrant and having DaSilva arrested by the Virginia authorities. Goyal also told Rivera that "later that same day which was the 25th of January he [presumably DaSilva] had been to Mr. Homan's address during the day some time and then later that evening he [presumably DaSilva] told Mr. Goyal that he [presumably DaSilva] had also called him [presumably Homan]."[6] The detective later stated that he was unsure whether the threats Goyal was describing were threats to Goyal himself or threats to someone else about which Goyal had been told.[7]

### B. The defense case.

### (1) Devinder Goyal's testimony.

The defendant, Devinder Goyal, testified that he was born in India, but that he is now a United States citizen and a certified public accountant. He stated that Irene DaSilva had worked for him for four to five weeks, but that she had quit. According to Goyal, Mrs. DaSilva simply failed to show up for work one day. Goyal denied having had any romantic relationship with Mrs. DaSilva.

According to Goyal, DaSilva frequently approached him "pitifully" to inquire about Irene. On one occasion, DaSilva called the office and spoke to a temporary employee

---

5. Although DaSilva's testimony on this point is not entirely clear, it appears that the telephone number which Goyal gave him following this assault was not Homan's number.

6. We have quoted this sentence verbatim, for the witness' use of the pronouns "he" and "him" was not entirely clear.

7. Goyal subsequently acknowledged, however, that the assaultive conduct by DaSilva which Goyal reported to the police in Virginia consisted of assaultive conduct vis-a-vis Goyal himself.

named Janet, whom Goyal had hired for a few days to answer telephone calls which were forwarded to her phone. According to Goyal, DaSilva apparently mistook Janet's voice for his missing wife's. Goyal testified that, from memory, he gave DaSilva Janet's telephone number. He believed that Janet's telephone had been disconnected, so that nobody would be harmed by the disclosure of the number.

Goyal denied that DaSilva had told him that he (DaSilva) had beaten Irene DaSilva. Goyal also claimed that he informed Homan that he had *not* given DaSilva Homan's telephone number. Responding to Detective Rivera's testimony, Goyal denied that he had told the detective that DaSilva had threatened *Goyal*. Rather, he explained to the detective that Homan had spoken to Goyal's secretary and had told her that DaSilva had threatened to kill *Homan*. Goyal stated that on one occasion, DaSilva, who was under the influence of alcohol at the time, seized him by the collar. Goyal reported this assault to the police on the following day. Goyal testified, however, that this incident occurred in March, 1993, well after the events involving Homan. He asserted that prior to March, 1993, he did not regard DaSilva as a threat.

At no time during the course of his testimony did Goyal deny that he had given DaSilva Homan's address, or that he had looked it up in a directory.

### (2) *Paul Dhaliwal's testimony.*

Paul Dhaliwal, a client of Goyal, testified that he met a woman named Janet David at a restaurant on K Street, N.W. Learning that Ms. David was looking for a job, he passed her name on to Goyal.

### C. *The trial judge's decision.*

At the conclusion of the evidence, and after disposing of several collateral matters,[8] the trial judge permitted the case to go to the jury on Homan's claim for compensatory damages for intentional infliction of emotional distress. The jury returned a verdict in Homan's favor. The judge then issued a 15–page memorandum opinion in which she entered JNOV in Goyal's favor.

In her opinion, the judge noted that to establish a claim for intentional infliction of emotional distress, the plaintiff must show (1) extreme and outrageous conduct on the part of the defendant, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *See, e.g., Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1965)) (hereinafter RESTATEMENT).[9] The judge concluded, as a matter of law, that Homan had failed to satisfy his burden with respect to any of these three elements. Homan filed a timely notice of appeal.

### II.

### ANALYSIS

### A. *The applicable legal standards.*

█ In determining whether or not the trial judge properly granted judgment for the defendant notwithstanding the verdict, the record must be viewed in the light most favorable to the plaintiff. *See Etheredge v. District of Columbia,* 635 A.2d 908, 915 (D.C. 1993). The plaintiff is entitled to the benefit of every reasonable inference from the evidence. *Id; see also Shewmaker v. Capital Transit Co.,* 79 U.S.App. D.C. 102, 103, 143 F.2d 142, 143 (1944). Indeed,

[i]t is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict. *Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1254–55 (D.C. 1991); *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979). Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass

---

8. The judge directed a verdict in Goyal's favor on Homan's claim of defamation and on his request for punitive damages. Homan has not challenged these rulings on appeal.

Goyal had also filed a counterclaim against Homan, claiming that Homan had threatened Goy-al's life. Goyal's counsel dismissed the counterclaim at the conclusion of the evidence.

9. No exception was taken by either party to this encapsulation of the elements of the tort, or to the judge's instructions to the jury.

upon the credibility of the witnesses. *Rich, supra,* 410 A.2d at 534 (citations omitted). If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury. *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc). *Etheredge, supra,* 635 A.2d at 915–16. These principles are applicable to actions for intentional infliction of emotional distress. *See, e.g., King v. Kidd,* 640 A.2d 656, 667–68 (D.C.1993).

■ The concept of "outrageousness" is central to the tort of which Goyal has been accused. Liability will be imposed only for conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 n. 10 (D.C.1994) (quoting RESTATEMENT, *supra,* § 46 comment h); *see also, e.g., Crowley v. North Am. Telecomms. Ass'n,* 691 A.2d 1169, 1172 (D.C.1997).

■ "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Drejza, supra,* 650 A.2d at 1316 (quoting RESTATEMENT, *supra,* § 46 comment h); *see also Waldon, supra,* 415 A.2d at 1078 (court must " 'set outer limits' on what may go to the jury," and this determination "necessarily involves some degree of judicial line-drawing") (citation omitted). "[This] threshold decision by the trial court is quintessentially one of law, and we review it *de novo.*" *Drejza, supra,* 650 A.2d at 1316. "Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* (quoting RESTATEMENT, *supra,* § 46 comment h).

■ As we pointed out in *Drejza,* "[t]he requirement of outrageousness is not an easy one to meet." *Id.* at 1312 (citations omitted). Liability will not be imposed for "mere insults, indignities, threats, annoyances, petty oppressions, or other triviali-

ties." *Waldon, supra,* 415 A.2d at 1076 (citations omitted); *see also Sterling Mirror of Md., Inc. v. Gordon,* 619 A.2d 64, 67 (D.C. 1993). "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughness of the mental hide is a better protection than the law could ever be." W. PAGE KEETON, PROSSER & KEETON ON TORTS § 12, at 56 (5th ed.1984) (quoting Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 HARV.L.REV. 1033, 1035 (1936)). Generally, a case of intentional infliction of emotional distress is made out only if "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " RESTATEMENT, *supra,* § 46 comment d.

*B. Outrageousness.*

In granting JNOV in Goyal's favor, the trial judge wrote that Goyal "gave Mr. DaSilva the plaintiff's name and his publicly listed address and phone number, and he falsely informed Mr. DaSilva that his wife could be found there." According to the judge, Goyal should have anticipated, on the basis of his own experience, that DaSilva "would call plaintiff, perhaps repeatedly, and that he would attempt to visit plaintiff." Nevertheless, the judge concluded "[a]s a matter of law ... that such calls and visits, even if they were persistent, were a mere annoyance which did not rise to the level of outrageous or intolerable conduct which would cause extreme emotional distress."

■ We disagree. The judge's impression that Goyal's conduct was annoying (but no worse than that) may well have represented a *permissible* view of the record, in the sense that a jury verdict in Goyal's favor could properly have been sustained. The judge's assessment of the evidence, however, was not the *only* permissible one. In particular, the trial judge's analysis overlooks the fact that DaSilva's conduct included death threats. There was thus evidentiary support for a conclusion by the jury that Goyal, whose life had been threatened by DaSilva before he gave DaSilva Homan's address, should have anticipated that DaSilva would

likewise make death threats to Homan. In our view, the jury's conclusion that Goyal's conduct was extreme and outrageous was entirely rational and legitimate, especially if the record is viewed, as it must be, in the light most favorable to the plaintiff.

If we accept as true the testimony of Homan and DaSilva, *see Etheredge, supra,* 635 A.2d at 915–16, then it has been established for purposes of this appeal, notwithstanding Goyal's contrary testimony, that Goyal gave DaSilva Homan's telephone number and told DaSilva that DaSilva's wife was living with the man who could be reached at that number. At the time that Goyal deliberately provided DaSilva with this information, which Goyal knew to be false, Goyal was also aware

1. that DaSilva had beaten his wife;

2. that DaSilva's wife had left him;

3. that, in response to his wife's departure, DaSilva had telephoned Goyal *approximately twenty times a day for a year,* and that he had come to Goyal's office approximately one hundred times, making it difficult for Goyal to run his business;

4. that DaSilva suspected Goyal on the basis of the flimsiest of evidence of being Irene DaSilva's lover; and

5. that DaSilva would probably harbor a similar suspicion of Homan.[10]

The record also establishes, without contradiction, that Goyal provided DaSilva with Homan's home address *after* Homan had informed Goyal that DaSilva had been harassing Homan with as many as twenty obsessive and accusatory telephone calls a night. The

jury could properly find that, by telling DaSilva where Homan lived, Goyal effectively assured that DaSilva's predictable harassment of Homan would not be limited to harassing telephone calls, but would include unsolicited and unfriendly visits—*numerous* unsolicited and unfriendly visits—to Homan's home.

Moreover, and most significantly, there was evidence on the basis of which the jury could rationally find that, at the time Goyal gave DaSilva Homan's address, Goyal had already received a death threat from DaSilva. Although Detective Rivera's evidence was not a model of clarity, the Detective testified that when he interviewed Goyal on January 29, 1993, Goyal told him that DaSilva "made threats against Mr. Goyal stating that [DaSilva] would kill [Goyal] if [DaSilva] couldn't locate his wife." Rivera further stated that his January 29 interview with Goyal took place "four days after the alleged incident." If we accept that testimony as true, then Goyal was threatened on January 25, 1993—the very date on which DaSilva also visited and threatened Homan. Putting these events together, the jury might plausibly conclude that on January 25, 1993, DaSilva was in a belligerent mood, that during business hours he visited and threatened Goyal (thus inducing Goyal to give him Homan's address), and that DaSilva then proceeded to Homan's apartment house to confront and threaten Homan. A fair-minded fact-finder could believe that this scenario was consistent with common sense, for a threat from DaSilva would provide the most plausible motive for Goyal to give DaSilva Homan's address.[11] Moreover, the jury

---

**10.** Indeed, DaSilva testified that Goyal told him that Mrs. DaSilva was living with Homan. DaSilva was therefore likely to be even more suspicious of Homan than he was of Goyal.

**11.** In the trial judge's view, "there was no evidence by which a reasonable juror could conclude that [DaSilva's threat to kill Goyal] occurred before defendant gave plaintiff's name and address to Mr. DaSilva." The judge pointed out that Detective Rivera was unsure of the date of the threat and that both Goyal and DaSilva testified that the lapel-pulling incident occurred after January 25, 1993.

Although a case can be made for the proposition that the threat to Goyal did not predate Goyal's

disclosure to DaSilva of Homan's address, that case is not necessarily compelling. Rivera testified, as we have noted, that during a January 29 interview Goyal gave him information about a threat to Goyal's life which DaSilva had made four days earlier.

The jury could therefore readily disbelieve Goyal's testimony about the date of the incident. In fact, Detective Rivera's notes apparently confirmed that Goyal had told Rivera on January 29, 1993 that Goyal was contemplating swearing out a warrant against DaSilva at that time. The threat to Goyal's life thus must have been made in January 1993 and not in March, as Goyal testified. The jury could therefore reasonably conclude that Goyal was testifying untruthfully

would have been warranted in drawing inferences adverse to Goyal both because he failed to explain why he told DaSilva where Homan lived, *see, e.g., Murphy v. McCloud,* 650 A.2d 202, 215–17 (D.C.1994), and because, for reasons stated in note 11, *supra,* there was reason to believe that Goyal's testimony regarding the date when DaSilva threatened him was disingenuous. *Id.* at 217 n. 29 (a party's falsehood in presenting his case may give rise to a strong inference of consciousness of guilt, and the trier of fact may properly infer that the party's entire cause lacks truth and merit).

In some, indeed most, instances, a few unwelcome visits from an irrational, angry and jealous husband, and some harassing telephone calls, would not be cognizable in an action for a tort which requires proof of extreme or outrageous conduct. In this case, however, Goyal knew that he himself had endured perhaps a hundred visits and probably thousands of phone calls, and that Homan could expect to be subject to the same treatment, if not worse. In other words, Goyal deliberately exposed Homan to the near-certainty of repeated harassment. "Repeated harassment may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Howard Univ. v. Best,* 484 A.2d 958, 988 (D.C.1984) (quoting *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979)). Finally, as we have noted, viewing the evidence in the light most favorable to Homan, Goyal had reason to believe, when he gave DaSilva Homan's address, that Homan's life might well be threatened, just as Goyal's own life had been.

In his closing argument to the jury, Homan's attorney stated:

> We submit to you that supplying the number and subsequently matching that number with an address of an innocent third party to a person who has such demonstrable instabilities and is whacked out like Gabriel DaSilva is, and then so obsessive and compulsive as he is, meets the definition of outrageous and extreme behavior.

not only when he claimed that the incident occurred after Goyal's dealings with Homan, but

At a minimum, reasonable people might differ as to whether Goyal's conduct was sufficiently extreme and outrageous. Under these circumstances, the jury's resolution of the issue should have been allowed to stand.

### C. *Intent and recklessness.*

In the trial judge's opinion, the evidence did not support a finding that Goyal possessed the requisite intent to harm Homan. The judge based her disposition of this issue on her view that, "[a]s stated above, the conduct itself was not extreme and outrageous." We have previously expressed our disagreement with the premise that, as a matter of law, Goyal's conduct was insufficiently outrageous. We also conclude that the question of intent, like the question of outrageousness, should have been left to the jury.

We have held, notwithstanding the name of the tort for which Homan sued Goyal, that "specific intent is not required; reckless infliction of emotional distress is sufficient." *Drejza, supra,* 650 A.2d at 1311 n. 8. Liability "extends to situations in which there is no certainty, but merely a high degree of probability, that the mental distress will follow, and the defendant goes ahead in conscious disregard of it." PROSSER, *supra,* § 12, at 64; *see also* RESTATEMENT, *supra,* § 46 comment i.

In the present case, the jury could reasonably conclude that Goyal deliberately disclosed Homan's telephone number and address to DaSilva while knowing full well that, in all probability, Homan would be harassed, tormented, and threatened by DaSilva. Indeed, Goyal gave out Homan's address after DaSilva had already, to Goyal's knowledge, begun his innumerable obsessive telephone calls. As plaintiff's counsel explained to the jury, Goyal "intentionally put Mr. Homan in harm's way. He intentionally said I'm tired of you stalking me, stalk him, he's got your wife, good riddance." The jury could rationally conclude that the record bore out counsel's words, and that Homan had satisfied the element of intent.

also when he asserted that, prior to March 1993, Goyal never considered DaSilva a threat.

### D. *The severity of the emotional distress.*

 Finally, the trial judge discerned insufficient support in the record for a finding that Homan "suffered any severe emotional distress which was proximately caused by defendant." We reach a different conclusion.

Homan testified, *inter alia*, that as a direct and predictable consequence of Goyal's intentional acts, Homan was subjected to ceaseless harassing telephone calls and a harrowing visit from DaSilva, that DaSilva threatened to kill him, that Homan was driven from his home for a month in fear for his life, that he missed a day of work, that he found it difficult to concentrate when he was at work, and that for a significant period he had no idea when and if his ordeal was going to end. In our view, the jury could properly find that the distress resulting from these events was sufficiently severe to support Homan's claim for relief.

Homan does not claim that his emotional distress generated any specific bodily injury.[12] We have held, however, that a plaintiff seeking to recover damages for intentional infliction of emotional distress need not prove that he suffered any physical harm. *See, e.g., Best, supra,* 484 A.2d at 985; *Waldon, supra,* 415 A.2d at 1076. In *Clark v. Associated Retail Credit Men,* 70 App.D.C. 183, 105 F.2d 62 (1939), the court stated that

> one who, without just cause or excuse, and beyond all the bounds of decency, purposely causes a disturbance of another's mental and emotional tranquility of so acute a nature that harmful physical consequences might be not unlikely to result, is subject to liability in damages for such mental and emotional disturbance even though no demonstrable physical consequences actually ensue.

70 App.D.C. at 186, 105 F.2d at 65 (quoting Magruder, *supra,* 49 HARV.L.REV. at 1058). Relying on the foregoing language from *Clark* and on several cases that have quoted from that decision, *see Waldon, supra,* 415 A.2d at 1076; *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *cf. Sterling Mirror, supra,* 619 A.2d at 67 (citing *Waldon*), the trial judge concluded that there was no evidence that Goyal intended to inflict emotional distress from which a physical injury might result, and that Homan therefore was not entitled to relief. We do not believe that *Clark* or its progeny support affirmance here.

As the court observed in *Clark,* "lawyers have begun to learn from doctors and physiologists that 'We fear not in our hearts alone, not in our brains alone, not in our viscera alone—fear influences every organ and tissue.'" 70 App.D.C. at 185, 105 F.2d at 64. Where, as in this case, Homan's life was threatened, and Homan was driven from his home as a direct consequence of Goyal's conduct, the jury could reasonably find that the *Clark* standard was satisfied. *See also* RESTATEMENT, *supra,* § 46 comment k ("if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without [bodily] harm"); *cf.* PROSSER, *supra,* § 12, at 64. Further, although severe distress must be proved, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." RESTATEMENT, *supra,* § 46 comment j.

We recognize that it was DaSilva, and not Goyal, who harassed and threatened Homan and made his life miserable. Viewing the evidence in the light most favorable to Homan, however, the jury could reasonably find that it was Goyal who made this unfortunate outcome highly probable if not inevitable. Without Goyal's deliberate self-serving intervention—"stalk him, not me"—Homan would never have been tormented. On this record, questions relating to outrageousness, intent and severity of harm were for the jury, not for the judge.

### III.

### CONCLUSION

For the foregoing reasons, the order of the trial judge granting the defendant's motion

---

12. There was no evidence, for example, that Homan consulted a psychiatrist or other physician as a result of Goyal's conduct.

for judgment notwithstanding the verdict is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.[13]

*So ordered.*

---

**13.** In the trial court, Goyal's motion for judgment notwithstanding the verdict was accompanied by a request, in the alternative, for a *remitti-* *tur.* Because the trial judge granted JNOV, she never reached the *remittitur* issue, and we do not address it.