Suzette DERZAVIS, Appellant,

v.

Frank BEPKO, M.D., et al., Appellees.

No. 96–CV–1023.

District of Columbia Court of Appeals.

Argued Dec. 11, 1997.

Decided Dec. 29, 2000.

Deborah A. Vitale, Alexandria, VA, for appellant.

Andrew E. Vernick, Anaapolis, MD, with whom Christian A. Lodowski was on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and RICHTER, Associate Judge of the Superior Court of the District of Columbia.*

TERRY, Associate Judge:

Appellant, Suzette Derzavis, filed suit against appellees, Dr. Frank Bepko and his professional corporation, Frank Bepko, M.D., P.C.[1] The complaint alleged that Dr. Bepko was negligent in, among other things, "failing to properly insert and/or employ [a] Cytobrush[2] so as to injure plaintiff." In the course of a five-day jury trial, appellant called four witnesses: herself, her mother, Dr. Bepko, and Dr. Deena Kleinerman, her sole expert witness. At the close of the plaintiff's case, appellees moved for judgment as a matter of law, which the trial judge denied, concluding that although the evidence was "not overwhelming," it was "enough to get past this stage." Appellees renewed the motion at the conclusion of the defense case,[3] but the

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. The original complaint also named as defendants International Cytobrush, Inc., Medscand USA, Inc., and Medscand AB, a Swedish corporation, but the claims against them were all dismissed before trial.

2. According to the testimony of appellant's expert witness, a Cytobrush is a brush with soft, flexible bristles which is specially designed for gathering cervical cells during a Pap smear. Although some doctors use a Q Tip swab, the witness said, a Cytobrush "tends to pick up cells better."

3. The defense consisted of testimony from Dr. Bepko and several other doctors.

judge again denied it, saying, "I think legally it is thin, but I wouldn't pull it from the jury at this point." Counsel for appellant requested a jury instruction on *res ipsa loquitur*, but the judge denied that as well.

The jury returned a verdict for Ms. Derzavis in the amount of $500,000. A few days later, appellees filed a written motion for judgment as a matter of law, or in the alternative for a new trial or remittitur. After Ms. Derzavis filed an opposition, the judge granted the motion for judgment as a matter of law without ruling on the two alternative requests. The judge concluded in his order that "the evidence was deficient with regard to all three elements" necessary to prevail in a medical negligence action. He ruled that Ms. Derzavis' expert witness had failed to establish an applicable standard of care because she "refused to testify categorically that the standard of care required a physician 'to be familiar with the manufacturer's instructions for use of an endocervical brush.' " In addition, the judge noted that, even assuming the evidence was sufficient to establish a standard of care, "the expert never testified that what defendant Bepko did—inserting the brush just beyond the last bristles—violated such a standard." Finally, the judge stated that because Dr. Kleinerman "could not articulate how defendant used the Cytobrush, when the injury occurred in the course of that use, or even what the injury was," Ms. Derzavis had failed to establish a causal connection between her alleged injury and Dr. Bepko's actions. Ms. Derzavis appeals; we affirm.

I

On December 30, 1989, Ms. Derzavis went to Dr. Bepko, a gynecologist, for a routine Pap smear and gynecological examination.[4] During the Pap smear, Dr. Bepko inserted a speculum without incident, but when he inserted a Cytobrush,[5] Ms. Derzavis felt "the worst pain [she had] ever experienced," and she yelled out. Dr. Bepko testified that he inserted the Cytobrush "to the point that the last bristle disappeared," rotated the brush, and then withdrew it. The entire procedure, he said, took about three seconds. Ms. Derzavis testified that she noticed that the slide and Dr. Bepko's gloves were full of blood and that Dr. Bepko quickly removed the speculum and left the room.[6] Ms. Derzavis, "very cold but perspiring at the same time," slowly got dressed and met with Dr. Bepko in his consultation room. According to her testimony, she repeatedly told Dr. Bepko that she was in great pain, but he gave her a hug and told her that she would be fine.

Upon arriving home, Ms. Derzavis said, she started to sit down on the edge of her bed but quickly realize d that she "couldn't sit down because [she] felt like [she] was sitting on a fiery fist." As she stood up, she "felt this warmth, and just to catch it [she put her] hands down [her] trousers . . . and when [she] took [her] palm out, it was a puddle of blood." She went to the bathroom and felt a need to urinate, "but the only thing that came out was blood ." Ms. Derzavis called Dr. Bepko to tell him that she was bleeding, and he suggested that she take a hot bath. The pain did not subside, and Ms. Derzavis continued to lose blood along with her urine, so she called Dr. Bepko the next day and asked whether she should go to a hospital emergency room. Dr. Bepko told Ms. Derzavis

---

**4.** Dr. Bepko had treated Ms. Derzavis since April 1980 and had previously performed two minor surgical procedures on her, with no adverse consequences.

**5.·** Dr. Bepko testified that he had previously used a Cytobrush during a Pap smear of Ms. Derzavis about three months earlier. On this occasion, he said, he told Ms. Derzavis that he was using a Cytobrush and that she might experience some cramping or spotting.

**6.** Dr. Bepko, on the other hand, testified that he showed Ms. Derzavis the Cytobrush, which was not bloody, and then performed a bimanual examination of Ms. Derzavis' cervix. He stated, "There was no blood at all. Absolutely not. No blood at all."

that if she went to the hospital, the doctors would have to examine her and were likely to re-irritate any injury that she might have.[7]

Three days later, on January 2, 1990, Ms. Derzavis returned to Dr. Bepko's office, still in great pain. According to her testimony, "he inserted one finger into [her] vagina and it came out with his glove being bloody so he said you're still bleeding. He asked me if that hurt. I said no, the pain was much higher. That was it. And he left." Dr. Bepko prescribed Monistat cream, Pyridium, and Valium.[8]

After these medications did not ease her pain, Ms. Derzavis began to see other physicians, all of whom provided only minimal relief.[9] The pain and bleeding continued to plague her. For example, the first time she had a menstrual period after the December 30 Pap smear, she felt pain comparable to a contraction. "I urinated all over myself, the blood came out again all over me, and my uterus just went jabbing, stabbing, really stabbing up, up, up, and then the pain went barreling down the backs of my legs."

At the time of trial, Ms. Derzavis said, she still had substantial pain that severely limited her daily activities. She testified that she could "hardly lift anything" and could not walk, swim, sit, do housecleaning, go to the beauty parlor, paint, go to the movies, or have sexual intercourse without extreme pain. The only medication that helped to relieve the pain was Motrin. One of her doctors suggested a hysterectomy, but there was no guarantee that such surgery would end her pain, so she did not have it done.

The only expert witness that Ms. Derzavis presented at trial was Dr. Deena Kleinerman, a specialist in obstetrics and gynecology. After two meetings with Ms. Derzavis in September 1993 and March 1994, and after reviewing her history and the reports of the other doctors, she concluded that Ms. Derzavis "was having continued pain and that the original onset of the pain was at the time of [the] examination ... on December 30, 1989."[10] As to the applicable standard of care for using Cytobrushes, Dr. Kleinerman stated that the standard in December 1989 was simply "for a physician to be aware of the correct use of the brush," either by reading the manufacturer's product information or through instruction from another specialist. In Dr. Kleinerman's opinion,

7. Erma Derzavis, Ms. Derzavis' mother, testified that her daughter was "sunny, happy, glowing" when she left for her appointment with Dr. Bepko, but when she returned, she was "greenish gray, teeth chattering, shaking, in shock."

8. Dr. Bepko gave a different account of Ms. Derzavis' visit on January 2: "I did a pelvic exam because I wanted to make sure that there wasn't something there, and if there was something there, I could take care of it. I wrote down, exam today perfectly normal, with a slight amount of old heme discharge." Heme discharge, he explained, was "a little watery discharge perhaps with some ... little specks of blood.... But it's only spotting, it's not a flow of blood."

9. Ms. Derzavis testified that she saw, among others, Dr. Ervine, who examined her and prescribed Flagyl, Topicort, Myanesin, Aprimirin, Prednisone, Medrol, and more Pyridium. Dr. Ervine then referred her to Dr. Gross, who performed a sonogram, and to Dr. Collea, who examined her and prescribed 3200 milligrams a day of Motrin. Dr. Collea in turn referred her to Dr. Pahira, who prescribed Ditropan. After Dr. Pahira, Ms. Derzavis went to Dr. Paul, who recommended a laparoscopy, which was never done. Dr. Marlow then conducted two magnetic resonance imaging (MRI) tests, which apparently were inconclusive. After that, Ms. Derzavis consulted Dr. Simon, Dr. Margolis, Dr. Becker, and Dr. Jerome. In addition, Dr. Stewart performed a dilation and curettage, which only made the pain worse. Dr. Anderson and Dr. Levitt had consultations, and Dr. Kogan conducted an examination which included a Pap smear and a sonogram. In all, Ms. Derzavis consulted about twenty different doctors, but obtained very little relief and no diagnosis of the cause of her continued pain.

10. It is significant to note that Ms. Derzavis refused to allow Dr. Kleinerman to conduct a physical examination because Ms. Derzavis thought it would be too painful.

the instructions that accompanied the Cytobrush comported with the proper standard for its use.[11]

When asked whether Dr. Bepko had "exercised that degree of skill, care and knowledge ordinarily possessed and used by board-certified obstetrician-gynecologists acting in the same or similar circumstances as were present in Suzette Derzavis' case on December 30, 1989," Dr. Kleinerman answered that in her opinion "such care was not exercised." She based that opinion "on the description of the patient, how she felt before the examination and what she felt during and after the examination," and on the notes and depositions from various doctors which she had reviewed. Dr. Kleinerman believed that the Pap smear was improperly performed in two respects: first, the inner portion of Ms. Derzavis' cervix was sampled before the outer portion,[12] and second, Dr. Bepko engaged in "excessive instrumentation." The only evidence of such excessive instrumentation that Dr. Kleinerman could identify, however, was that Dr. Bepko inserted the Cytobrush until the last bristle was not visible. As to causation, Dr. Kleinerman stated that Dr. Bepko's deviation from the standard was the direct cause of injury to Ms. Derzavis, but she also said that inserting a Cytobrush one additional bristle was not likely to cause damage.

On cross-examination, Dr. Kleinerman admitted that she had never seen or heard of an injury such as that of Ms. Derzavis resulting from the use of a Cytobrush. In addition, she agreed with counsel's statement that "there is no evidence that Dr. Bepko used excessive or too much force when he used the bristle brush on Ms. Derzavis...." She also conceded that, although she thought Dr. Bepko had used "excessive instrumentation," she did not see him take the Pap smear and did not know exactly when Ms. Derzavis began to experience pain. Moreover, Dr. Kleinerman acknowledged that she herself had never read a package insert for a Cytobrush but had been instructed on its use by another doctor. She also agreed that she did not "have any evidence in this case to allow [her] to conclude that Doctor Bepko went in too deeply when he used the brush...."

In their defense, appellees presented evidence that Ms. Derzavis was emotionally unstable, that she had complained of numerous maladies in the past, and that none of her myriad physicians could diagnose any injury attributable to negligence on the part of Dr. Bepko. Dr. Bepko testified that he had referred Ms. Derzavis to a psychiatrist on numerous occasions, including one time in May 1980 after she called Dr. Bepko's nurse and "started complaining of burning in her abdomen, she had a burning fist in her abdomen." According to Dr. Bepko, Ms. Derzavis "had many, many complaints, along with frequent visits to many physicians."[13] Dr. Bepko testified that after every pelvic examination, Ms. Derzavis would "bend over and walk over, walk bowlegged as if she was hurting. She'd be rubbing her back, rubbing her thighs and complaining ... [and] was rambling, rambling on." Dr. Bepko attributed Ms. Derzavis' condition in this case to a psychophysiologic reaction to the December 30, 1989, pelvic examination.[14]

11. The instructions accompanying the Cytobrush were admitted into evidence at trial, but were not initially included in the record on appeal. It was not until long after oral argument that we were able to locate them and to have them transmitted to this court as a supplemental record.

12. According to her reply brief, Ms. Derzavis does not contend that this caused her injury.

13. Ms. Derzavis admitted on cross-examination that Dr. Feffer, who examined her for "joint pain all over the body" on August 9, 1993, concluded that she was a hypochondriac.

14. Dr. Bepko explained that "psychophysiologic" refers to "a symptom, a disease where there's no basis in fact. You examine the patient, there's absolutely nothing you can find to support what she appears to be having."

Dr. Arthur Becker, an obstetrician and gynecologist, testified that he saw Ms. Derzavis in June 1990 and conducted a physical examination with Pap smears, using a Cytobrush. He diagnosed severe vaginismus, which is "an involuntary contraction of the outer muscles of the vagina . . . while someone is trying to examine the patient, and this usually will make the examination difficult." He also testified that "there was a slight amount of tenderness in touching the cervix." Dr. Becker concluded that Ms. Derzavis had "vaginal lower pelvic pain of unknown etiology" and recommended that she have a psychiatric evaluation.[15]

Dr. Donald Sewell, an obstetrician and gynecologist, testified that he spoke with Ms. Derzavis in August 1993 and examined her in September 1994. He himself inspected the December 1989 Pap smear and found no blood on the slide, and he concluded that Dr. Bepko had performed the Pap test correctly. In Dr. Sewell's opinion, it was within the standard of care for Dr. Bepko "to put the brush into the cervix to the point where he could just see the last bristles disappearing into the opening of the cervix." After reviewing the medical records of all the doctors who treated Ms. Derzavis, Dr. Sewell observed that "no one came up with an anatomical basis for her pain." Dr. Sewell concluded that there was "no way that [Ms. Derzavis] could have suffered a nerve injury" as a result of Dr. Bepko's Pap smear.

Dr. Kenneth Ullman, a general psychiatrist, testified that he evaluated Ms. Derzavis twice in January 1994 and concluded that she had both a somaform disorder, which occurs when a person's psychological problems are manifested in physical symptoms, and a histrionic personality disorder, and that she was depressed. Dr. Joseph Collea, a professor of obstetrics and gynecology at Georgetown University, testified that he performed a pelvic exami-

nation on January 31, 1990, a month after the Pap smear at issue, and found no abnormalities. He described Ms. Derzavis as "the most agitated patient I've ever seen in my life before or since [that] time." Dr. Harry Ervine, an obstetrician and gynecologist in private practice, testified that he examined Ms. Derzavis on January 4, 1990, and "didn't find anything of note except for a small vaginal discharge." Dr. James Barker, an associate professor of gynecology at Georgetown University, testified that he had never encountered a case in which a Pap smear caused the sort of damage that Ms. Derzavis alleged. He also stated that, in his opinion, it was "perfectly fine" to insert a Cytobrush until the last bristle disappeared into the cervix because "[t]he more that you sample, the better for the patient." Dr. James Simon, an associate professor of reproductive endocrinology at Georgetown University, testified that he had an office consultation with Ms. Derzavis in January 1990 in which he "sat there and listened to her literally yell at me, scream at me. And I waited for what was a very, very long time in the hope that she would quiet down and relax and allow me to elicit the proper history. But when that never occurred, I asked her to leave the office. . . . I couldn't get any history from her."

## II

In a medical malpractice case, the plaintiff has the burden of proving the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury. "Expert testimony is usually required to establish each of [these] elements, except where proof is so obvious as to lie within the ken of the average lay juror." *Washington v. Washington Hospital Center,* 579 A.2d 177, 181 (D.C.1990) (citations omitted); *see Lasley v. Georgetown University,* 688 A.2d

---

**15.** Dr. Becker also testified that using a Cytobrush "is not only acceptable but is probably one of the better ways of doing a Pap smear

. . . because it is the least traumatic to the cervix. . . ."

1381, 1383 (D.C.1997) (rule requiring expert testimony applies to proof of causation), *cert. denied,* 522 U.S. 1060, 118 S.Ct. 719, 139 L.Ed.2d 659 (1998). Because the present case "involve[d] ... the exercise of professional skill and judgment," expert testimony was required to make a *prima facie* showing of negligence. *Harris v. Cafritz Memorial Hospital,* 364 A.2d 135, 137 (D.C.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977); *accord, e.g., Eibl v. Kogan,* 494 A.2d 640, 643 (D.C.1985).

Viewing the evidence in the light most favorable to Ms. Derzavis, we observe that her expert witness testified to the following: (1) that the applicable standard of care was "for a physician to be aware of the correct use of" a Cytobrush and that the instructions accompanying the Cytobrush "comported" with the standard of care; (2) that in her opinion Dr. Bepko deviated from that standard by engaging in "excessive instrumentation"; and (3) that in her opinion a causal relationship existed between that deviation and Ms. Derzavis' injury.

### A. *Standard of care*

■ To prove the relevant standard of care, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (citations omitted). It is not enough for the expert to testify as to what he or she would have done in a particular case. *Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C.1988); *Meek,* 484 A.2d at 581.

■ In this instance, the only applicable standard of care that Ms. Derzavis' expert identified in her testimony was that a doctor should know how to use a Cytobrush correctly. Dr. Kleinerman testified that, in her opinion, the standard of care required a "physician to be aware of the correct use of the brush," but she never stated what that "correct use" was. She

did testify that the instructions accompanying the Cytobrush "comported" with the standard of care for its use, which indicates that a physician who followed the written instructions would have been acting within the standard of care. Significantly, however, she did not testify that if a physician had failed to follow the instructions, that physician would have breached the standard of care. On the contrary, it was her opinion that it would be within the standard of care for a doctor to learn the correct way to use a Cytobrush *either* by reading the manufacturer's instructions *or* by learning how to use it from another physician. In fact, until this case came along, Dr. Kleinerman had never personally read the instructions and had been directed by a senior physician on how to use the Cytobrush. Because Dr. Kleinerman never stated what the standard of care was for the use of a Cytobrush, and because she admitted that a physician could learn to use the Cytobrush properly without reading the written instructions, her testimony was not sufficient to establish the applicable standard of care.

The manufacturer's package insert, which included written instructions for using the Cytobrush, was also introduced in evidence. In pertinent part, those instructions state:

> [G]ently insert the Cytobrush device into the endocervix until only the bristles closest to the handle are exposed. Slowly rotate one half to one full turn. Remove.

This court has held that such a package insert, standing alone, does not establish a standard of care, but is admissible only as *prima facie* proof of proper use. *Garvey v. O'Donoghue,* 530 A.2d 1141, 1146 (D.C. 1987) (citing *Nolan v. Dillon,* 261 Md. 516, 540, 276 A.2d 36, 49 (1971)); *accord, Monk v. Doctors Hospital,* 131 U.S.App. D.C. 174, 176, 403 F.2d 580, 582 (1968). "When the package insert ... is offered in conjunction with expert testimony, however, *that combination* may be sufficient to establish the standard of care." *Garvey,* 530

A.2d at 1146 (citation omitted; emphasis added).

■ We are thus confronted with the question of whether the testimony of Dr. Kleinerman, *in combination with* the manufacturer's instructions, would permit the jury to determine what the standard of care actually was. Dr. Kleinerman said that the instructions "comported" with the standard of care, but she also said that a physician could learn how to use a Cytobrush from another physician, *i.e.,* without reading the manufacturer's instructions. Under *Garvey,* the instructions themselves were insufficient to prove the standard of care, and it does not appear that Dr. Kleinerman's testimony provided the missing element of proof. We need not rule definitively on this point, however. Even if we assume for the sake of argument that the standard of care was sufficiently proven, we nevertheless conclude that Ms. Derzavis failed to prove either a breach of the standard of care or—most importantly— proximate cause.

### B. *Deviation from the standard*

■ Even if we accept Dr. Kleinerman's testimony that the applicable standard of care was for a physician to be aware of the correct way to use a Cytobrush, there was no evidence that Dr. Bepko deviated from that standard. In fact, Ms. Derzavis did not present any evidence that Dr. Bepko had never been instructed, or had been instructed incorrectly, in the use of a Cytobrush. Her evidence focused instead on the way he inserted the brush when he conducted the Pap test.

Dr. Kleinerman did say that she believed Dr. Bepko violated the standard of care because he engaged in "excessive instrumentation." The only basis she offered for that conclusion, however, was the

fact that Dr. Bepko inserted the Cytobrush until the last bristle disappeared. But neither Dr. Kleinerman nor anyone else testified that inserting the brush into the cervix until the last bristle disappeared violated the standard of care. At most, the package insert, which said that the Cyobrush should be inserted "until only the bristles closest to the handle are exposed," constituted *"prima facie* proof of proper use," *Garvey,* 530 A.2d at 1146, but there was no evidence that inserting the Cytobrush one bristle farther amounted to improper use. We therefore hold that Ms. Derzavis did not present sufficient evidence to prove the second element of her malpractice claim: that Dr. Bepko deviated from the applicable standard of care.[16]

### C. *Causation*

■ Ms. Derzavis argues that the jury could permissibly infer that her injury, because it was contemporaneous with the Pap smear, resulted from negligence on the part of Dr. Bepko. She asserts in her brief that "[t]he most compelling evidence, as Dr. Kleinerman noted, was the temporal relationship between the onset of pain and the injury." Dr. Kleinerman did so testify, but she also admitted that there was "no evidence that Dr. Bepko used excessive force or too much force" when he inserted the Cytobrush, and she agreed with counsel's statement that there was no basis in the evidence "to conclude that Doctor Bepko went in too deeply when he used the brush ." The trial judge, in granting appellees' motion for judgment as a matter of law, concluded that Ms. Derzavis

> failed to establish ... the causal link between her injury and defendant Bepko's actions. Dr. Kleinerman could not articulate how defendant used the Cytobrush, when the injury occurred in the

16. Ms. Derzavis contends that the trial court "inadvertently overlooked Dr. Bepko's testimony which in itself provided evidence of deviation from the standard of care." According to Ms. Derzavis' brief, Dr. Bepko allegedly said that he "introduced the brush until you couldn't see the last bristles at-

tached to the handle." Since the trial judge stated in his order that he had "reviewed the entire record in the case" when ruling on the post-trial motion, there is no reason for us to conclude that he overlooked Dr. Bepko's testimony.

course of that use, or even what the injury was.... She never explained at what point the injury actually took place or what the mechanism of the injury was.

We agree with the judge's analysis of the evidence and with his conclusion that Ms. Derzavis failed to prove that any act by Dr. Bepko caused any injury to her.

■ In order to establish proximate cause, "[t]he expert need only state an *opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries.*" *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986) (citations omitted). But the expert may not base such an opinion merely on "a proximate temporal association" between a medical procedure and an injury. *Lasley v. Georgetown University, supra,* 688 A.2d at 1387. "Without more, this proximate temporal relationship will not support a finding of causation." *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir. 1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984), cited in *Lasley,* 688 A.2d at 1387. To hold otherwise—*i.e.,* to hold "that contemporaneity proved causation"—would improperly shift the burden of proof from the plaintiff to the defendant and "would in effect be forcing defendants to disprove causality." *Id.* We rejected such an argument in *Lasley,* and we reject it again here.

In support of her claim that she adduced sufficient evidence of causation, Ms. Derzavis cites our decision in *McCoy v. Quadrangle Development Corp.,* 470 A.2d 1256 (D.C.1983), in which we said, "Where there are no eyewitnesses to an accident and the cause thereof cannot be established by direct proof, then the facts which can be established circumstantially may justify an inference by the jury that negligent conditions produced the injury." *Id.* at 1259 (footnote omitted). In *McCoy,* a wrongful death case, the evidence showed that the decedent was last seen when he returned to his office late one night after eating dinner with some of his co-workers. The next morning his body was found at the bottom of an elevator shaft. The plaintiff submitted evidence that the elevator had a history of malfunctioning and had not been working properly on the evening of the decedent's death. The trial court granted summary judgment for the owner of the office building, but this court reversed and remanded the case for trial. We held that the history of the malfunctioning elevator was sufficient to raise a jury issue as to the possible negligence of the building owner. There is, of course, no comparable evidence in the case at bar. Moreover, *McCoy* stands for the basic proposition that when there is evidence from which a trier of fact may find negligence, the case cannot be decided on summary judgment.[17] Ms. Derzavis apparently reads *McCoy* to state that if there are no witnesses to an accident, the court automatically assumes causation. That is plainly not what *McCoy* says. Because there is no circumstantial evidence here similar to that presented in *McCoy,* we conclude that *McCoy* has no bearing on this case.

Ms. Derzavis further contends that "the trial court erred in imposing on the plaintiff the duty to prove that another female had been similarly injured with a Cytobrush in order to establish a prima facie case of negligence." Regardless of whether such a ruling would be right or wrong, the record makes clear that the trial court did not impose such a burden. The judge relied on the evidence presented at trial, which he summarized and quoted in detail in his order, to conclude that Ms. Derzavis had failed to prove all the elements of medical malpractice. In addition, he noted that "neither party offered any evidence to show that this medical procedure ever affected anyone as plaintiff claims it affected her," citing appellees' statement that Ms. Derzavis "stands alone in a sea of hun-

---

17. In the instant case, unlike *McCoy,* there was a full trial lasting five days.

dreds of millions of women." The judge did not rely on this statement as a basis for saying that Ms. Derzavis failed to establish a *prima facie* case. Rather, we read it as reflecting the legal reality: that her expert witness simply did not provide the necessary testimony.

### III

Ms. Derzavis makes two additional arguments which we may treat more briefly.

■ First, she contends that the trial judge erred in refusing to instruct the jury on the doctrine of *res ipsa loquitur*. This court has held, however:

> [I]f a case involves the merits and performance of scientific treatment, complex medical procedures, or the exercise of professional skill and judgment, a jury will not be qualified to determine whether there was unskillful or negligent treatment without the aid of expert testimony. As a basis for invoking the doctrine of *res ipsa loquitur* in this type of situation, the plaintiff must at least present some expert opinion that the event will not usually occur if due care is used.

*Harris v. Cafritz Memorial Hospital, supra*, 364 A.2d at 137 (citations and footnote omitted). We conclude, as did the trial judge, that the testimony of Ms. Derzavis' expert was not sufficient, under *Harris*, to lay a foundation for a *res ipsa* instruction.

■ Second, Ms. Derzavis maintains that we should reverse the judgment because appellees attached material not in evidence to their post-trial motion for judgment as a matter of law. Although appellees may have used poor judgment in doing so, there is no indication that the granting of the motion was tainted by that material; on the contrary, the judge's order clearly set forth the evidence on which he relied in ruling on the motion, and all of it was properly before him. Consequently, the submission of any improper material does not require reversal.

The judgment of the trial court is therefore

*Affirmed.*

WAGNER, Chief Judge, dissenting:

The majority, as did the trial court, concludes that Derzavis failed to establish any of the three elements of her medical negligence claim. In my opinion, the record reveals otherwise. The three-part burden requires a plaintiff to establish "(1) the applicable standard of care; (2) a deviation from that standard; and (3) a causal relationship between that deviation and [her] injury." *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990). Plaintiff's expert, Dr. Deena Kleinerman, testified that the standard of care at the time relevant hereto for the use of the cytobrush, which allegedly caused Derzavis' injuries, comported with the manufacturer's instructions which were admitted into evidence as plaintiff's exhibit 15–A. Not only did Derzavis' expert so testify, but also Dr. Donald Sewell, one of appellee's own experts, testified that it was his opinion that the instructions in the same exhibit comported with the standard of care at that time. Those instructions stated, among other information, that the device should be inserted "into the endocervix until only the bristles closest to the handle are exposed." Dr. Kleinerman also testified that the standard of care required that a physician know how to insert the instrument correctly. This evidence forms an adequate factual basis for the establishment of the first element of this medical negligence claim, *i.e.*, the applicable standard of care.

The majority reaches a different determination on this issue primarily because of a mistaken premise, specifically, that the expert's only testimony concerning the applicable standard of care was that a doctor should know how to use the cytobrush correctly. That a physician should know how to use the cytobrush correctly was not the only applicable standard of care about which Dr. Kleinerman provided an expert

opinion. Rather, Dr. Kleinerman testified that the standard of care for use of the cytobrush was as described in the manufacturer's insert, which was admitted into evidence. I cannot agree that Dr. Kleinerman's testimony that a physician can learn the proper usage of the cytobrush from either the manufacturer's insert or instructions from other physicians eliminates the evidentiary value of the opinions of the two experts that the standard of care for the procedure was accurately stated in the manufacturer's insert.

The second element of Derzavis' claim is also proved adequately to withstand a motion for judgment as a matter of law. Relevant to this issue, Dr. Kleinerman testified that appellee did not exercise that degree of skill, care and knowledge ordinarily possessed by a board certified obstetrician-gynecologist acting under the same or similar circumstances. More specifically, Dr. Kleinerman testified that appellee did not use the cytobrush "in the way that we were taught or for that matter as in the instruction sheet as being the proper way to use it." Dr. Kleinerman based her opinion on Derzavis' description about how she felt before the examination as contrasted with the severe pain she felt during the examination as well as a description of how Dr. Bepko performed the examination. According to Dr. Bepko, he "introduced the brush until you couldn't see the last bristles attached to the handle," while the standard of care required that it be inserted "until only the bristles closest to the handle are exposed." This evidence, as well as other evidence bearing on the issue, is adequate to allow the jury to decide whether appellee deviated from the standard of care.

The adequacy of the evidence to support the third element for a medical negligence claim, while perhaps a closer question, is one which must be resolved in Derzavis' favor under our standard of review. This element was supported by expert testimony as well as other evidence properly relied upon by the expert. Dr. Kleinerman testified that, to a reasonable degree of medical certainty, appellee's breach of the standard of care caused injuries and damages to Derzavis. She testified that her opinion was based upon Derzavis' description of how she felt before and during the examination and notes and deposition testimony which included a description of how Dr. Bepko performed the Pap smear with the cytobrush. She explained the importance of the temporal connection between the use of the cytobrush and the immediacy of Derzavis' pain. Dr. Kleinerman explained that Derzavis felt fine, or not particularly uncomfortable before the examination, but felt extreme pain when the cytobrush was used. This medical expert testified that, to a reasonable degree of medical certainty, the patient should not experience this kind of pain if the taking of the Pap smear had comported with the applicable standard of care. Other evidence established the simultaneity between the Pap smear and the onset of Derzavis' symptoms. Derzavis testified that she had no symptoms when she went for the medical appointment for a Pap smear. Dr. Bepko testified initially concerning the use of the cytobrush in performing the Pap smear on Derzavis that "I inserted it. At this point she yelled and said, ... what are you doing to me, or words to that effect." He later testified that the patient screamed either while he was going in or coming out with the cytobrush. Derzavis testified that she screamed so loudly because of the pain, the worst she had ever felt in her life, and the nurse came into the room. She also testified that she noticed that the slide Dr. Bepko took was full of blood, and she asked him about it, to which he responded, "I did that." There was also evidence that Derzavis experienced coldness, perspiration, and weakness immediately, and more profuse bleeding after the incident. This evidence was sufficient to avoid judgment as a matter of law on the issue of causation. It was for the jury to determine whether to accept or reject the expert's opinion, considering the expert's "edu-

cation, experience, the reasons given for the opinion, the expert's credibility, and all the other evidence in the case." STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 3–3 (Rev. Ed.1998).

This case differs from this court's decision in *Lasley v. Georgetown Univ.*, 688 A.2d 1381 (D.C.1997), *cert. denied,* 522 U.S. 1060, 118 S.Ct. 719, 139 L.Ed.2d 659 (1998), cited by the majority, in which we held that "[i]n a medically complicated case ... contemporaneity between a medical procedure and an injury is too weak a foundation upon which to infer causation." 688 A.2d at 1387. The issue in *Lasley* was whether "it was fatal to Lasley's claim that none of his witnesses explicitly asserted that the embolization procedure caused his AVM [arteriovenous malformation] to rupture and hemorrhage." *Id.* at 1383. Since the rupture and bleeding occurred during the embolization procedure, Lasley contended that expert testimony of a causal link was not necessary.[1] *Id.* In *Lasley,* unlike the present case, there was a complicated pre-existing condition, an AVM, which had the potential for rupture even without the medical procedure. Since it was determined to be necessary for the jury to understand how or why the procedure, rather than the AVM, caused the harm, the lack of expert testimony was fatal to Lasley's claim. *Id.* at 1385. The present case is much less complicated. Derzavis presented to the physician with no pre-existing medical condition related to her injury here. According to the evidence, appellee breached the standard of care in using the cytobrush during an examination, and the patient immediately experienced excruciating pain and bleeding which the expert testified would not have occurred but for the improper use of the instrument. Even assuming that the injury was not of the type which by its nature reflected its cause, there was expert opinion testimony explaining its cause and the basis for that opinion.

"In reviewing the trial court's grant of a judgment notwithstanding the verdict, we apply the same standard as the trial court." *Durphy v. Kaiser Found. Health Plan,* 698 A.2d 459, 465 (D.C.1997) (citation omitted); *Washington, supra,* 579 A.2d at 181 (citations omitted). A judgment notwithstanding the verdict may be entered " 'only when, viewing the evidence and reasonable inferences in the light most favorable to the party who secured the jury verdict, no juror could reasonably reach a verdict for the opponent of the motion.' " *Id.* (citing *District of Columbia v. White,* 442 A.2d 159, 163 n. 9 (D.C. 1982)). It appears that the majority may not be applying that standard, particularly with respect to the deference it appears to accord the trial court's review of the issue of causation.[2] It is not appropriate to set aside a jury verdict because other evidence, some of which is outlined in the majority opinion, might have allowed the jury to reach a different result. " 'It is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses.' " *Homan v. Goyal,* 711 A.2d 812, 817–18 (D.C.1998) (quoting *Etheredge v. District of Columbia,* 635 A.2d 908, 915–16 (D.C. 1993) (other citations omitted)). It is only in rare cases, "in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict." *Homan,* 711 A.2d at 817 (quoting *Etheredge,* 635 A.2d at 915–16 (quoting *Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1254–

---

1. Lasley argued that

   [c]ausation in this case is simple because the causation is obvious. He stresses that only two possibilities exist: Either the embolization procedure or the AVM itself caused his blood vessels to rupture and hemorrhage. Moreover, the rupture and bleeding occurred during the embolization procedure. In Lasley's estimation, the temporal coincidence of the procedure and the rupture reveals the causal link between them.

   *Lasley, supra,* 688 A.2d at 1383.

2. See majority opinion at 521–522.

55 (D.C.1991) (other citation omitted))). This is not one of those rare cases, in my view. Viewing the evidence and reasonable inferences in the light most favorable to Derzavis, as we must, it cannot be said that no reasonable juror could reach a verdict in her favor. *See Washington,* 579 A.2d at 181. Therefore, I respectfully dissent.[3]

---

**3.** While I would reverse the grant of judgment for appellee, I would remand the case to the trial court for consideration of appellee's alternative request for a new trial or remittitur. *See* Super. Ct. Civil R. 50(c); *Spain v.* *McNeal,* 337 A.2d 507, 511 (D.C.1975) (the trial court should rule on alternate motion, even if a judgment notwithstanding the verdict is granted).