Mary C. GUBBINS and Shelton
Davis, Appellants,

v.

Susan B. HURSON, M.D.,
et al., Appellees.

No. 03–CV–780.

District of Columbia Court of Appeals.

Argued April 21, 2005.

Decided Oct. 14, 2005.

Barry J. Nace, for appellants.

Steven A. Hamilton, with whom Karen S. Karlin, Bethesda, MD, was on the brief, for appellee Susan B. Hurson.

R. Harrison Pledger, Jr., McLean, Va, for appellees Jae–Koo Kim and Northwest Anesthesiology Group, P.C.

Before TERRY, WAGNER,* and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Mary C. Gubbins and Shelton Davis appeal the judgment entered against them following the trial by jury of their medical malpractice claims against Susan Hurson, M.D., Jae–Koo Kim, M.D., Northwest Anesthesiology Group, P.C., and Sibley Memorial Hospital. We hold that the trial court erred in admitting previously undisclosed expert opinion testimony and in refusing to instruct the jury on the doctrine of *res ipsa loquitur*. Taken together, these errors entitle appellants to a new trial.

I.

In late December 1996, Mary Gubbins underwent surgery at Sibley Memorial Hospital to repair a leaking bladder and remedy an associated condition known as urinary stress incontinence. After Dr.

* Judge Wagner was Chief Judge of the court at the time this case was argued. Her status changed to Associate Judge on August 6, 2005.

Jae–Koo Kim administered anesthesia through an epidural catheter, Dr. Susan Hurson performed a hymenal remnant excision and anterior and posterior repair. The surgery was seemingly without complication, and it appeared to alleviate Gubbins's bladder problems. After the surgery, however, Gubbins experienced numbness and weakness in her legs, fell to the floor, and was unable to stand or walk.

Dr. Hurson referred Gubbins to Dr. Frank Anderson, a neurologist, who in turn referred Gubbins to a second neurologist, Dr. John Kelly, for an electromyography (EMG). Dr. Kelly conducted the EMG and diagnosed nerve damage at the L3–L4 level of the spine. Gubbins received physical therapy, but she still was confined to a wheelchair when she was discharged from the Hospital in mid-January 1997. After further therapy on an outpatient basis, Gubbins regained the use of her legs but continued to experience pain and impaired mobility.

Gubbins was unable to obtain an explanation of her nerve injury from her health care providers. Drs. Anderson and Kelly told her only that the anesthetic medication she was given during her surgery had injured her nerves somehow. Sibley Memorial Hospital conducted a review and, according to a letter from its Chief Executive Officer, investigated a number of possible causes, including: a problem with the anesthetic medication as provided by the drug manufacturer; the "remote possibility" that someone tampered with the medication; pharmacy error; improper programming or malfunction of the pump that was used to administer the medication; an "allergic type reaction to the medication"; "surgical positioning"; an "anesthesia technique problem with respect to the placement of the epidural catheter or subsequent migration of the catheter causing a central nervous system paralysis and/or peripheral nerve injury"; "complications from the administration of the anesthesia via an epidural catheter"; and unspecified other "complications associated with the surgical procedures." The Hospital's investigation ruled out some possibilities, such as pharmacy error, pump misuse or malfunction, and a problem with the medication. Further, the Hospital reported, "[a]ll of the physicians we talked to and the pharmacy consultant agreed that it was unlikely that Ms. Gubbins experienced a drug allergy." There did exist "a possibility," the report continued, "that the complication was related to surgical positioning," but this had not been established and would have been "very unusual." Finally, regarding "anesthesia technique," the investigation found no evidence of any problem with the "placement or functioning of the epidural catheter." In short, the Hospital had "no definitive answer" to provide.

In December 1999, Gubbins and her husband, Shelton Davis, filed suit in Superior Court, alleging malpractice by Drs. Hurson and Kim and the Hospital staff who participated in the operation. At trial, which took place in June 2003, appellants advanced alternative theories of negligence, focusing primarily on the administration of anesthesia by Dr. Kim and the positioning of the patient's legs by Dr. Hurson during the surgery. Appellants also sought to establish negligence by invoking *res ipsa loquitur*, but the trial court precluded reliance on that doctrine. The jury returned a defense verdict, and this appeal followed.[1]

1. Sibley Memorial Hospital is not a party to this appeal. We are informed that the Hospital reached a settlement with appellants.

## II.

Appellants claim that the court made a number of prejudicially erroneous rulings against them in the course of a rather lengthy trial. It is unnecessary to address all of appellants' assignments of error. We conclude that the trial court erred in two key rulings. In combination, these two errors require us to reverse and remand for a new trial.

### A.

■ The first ruling allowed defense counsel to present expert opinion testimony regarding causation from a treating physician whom appellants had called only as a fact witness. Appellants contend that the court erred in admitting this surprise testimony over their objection that no party had designated the physician as an expert in pretrial discovery pursuant to Superior Court Civil Rule 26(b)(4). Because the defendants did not establish, and it did not otherwise appear, that the physician had reached his critical opinions in the course of treating Gubbins, rather than in anticipation of litigation or trial, we hold that appellants' objections to the testimony should have been sustained.

Appellants called Dr. John Kelly as their first witness. In his direct examination, Dr. Kelly, who had been identified in appellants' pretrial disclosures solely as a fact witness, testified about the EMG he performed on Gubbins in January 1997. The EMG showed "marked denervation bilaterally in [her] quads and IP [iliopsoas] muscles," meaning that in both her legs, the nerves had suffered damage ("severe axonal lesions") and become detached from the knee extensor and hip flexor muscles. The principal damage was localized "inside

the spine, affecting the nerve roots, before they left the spinal column to go down the legs, on both sides." As a result, Dr. Kelly explained, Gubbins had lost voluntary control of her legs; the interruption of nerve impulses caused the muscles to fibrillate or "twitch" without coordination, involuntarily and spontaneously.

Dr. Kelly next examined Gubbins in April 2002. By then, he testified, her legs had regained much of their strength, and her walking was more stable. She continued, however, to experience pain and hypersensitivity "from the hips to the feet." Diagnosing this condition as "a post-neuritic pain syndrome" attributable to residual irritation of the previously damaged nerves, Dr. Kelly prescribed medication that diminishes nerve pain by slowing nerve impulses.

Although the direct examination of Dr. Kelly was confined to his testing, diagnosis and treatment of Gubbins, the cross-examination was not so limited. Over appellants' objection, the court permitted the defendants, who had not listed Dr. Kelly as an expert witness in pretrial discovery, to elicit his opinions concerning the cause of Gubbins's nerve damage. Based on his overall experience with other patients in his EMG referral practice,[2] Dr. Kelly agreed with defense counsel that surgical patients "can have reactions like [the nerve damage sustained by Gubbins] even in the absence of any health-care provider, whether it be a surgeon, or an anesthesiologist, or [ ] hospital personnel deviating from any standards of care." The occurrence of nerve complications, therefore, did not suggest to Dr. Kelly that Gubbins's medical treatment was faulty; on the con-

---

**2.** Dr. Kelly testified on cross that Gubbins was not the first (or last) patient he had seen for post-operative nerve injury; even though "it's a relatively rare problem in the commu-

nity," he explained, "when you run a large neuromuscular EMG referral practice, most of those patients eventually come to you."

trary, even if everything is done "perfectly fine," he believed, "the so-called idiosyncratic, or unusual reaction can occur, and it can cause problems like this." Although he had written in his January 1997 EMG report that "[t]his is a peculiar case, and the etiology is not at all certain," Dr. Kelly was allowed on cross-examination to express his further opinion—based upon his examination of Gubbins, his experience, and his education—that Gubbins's nerve damage resulted from an unusual and unpredictable reaction to the "anesthetic agent" used during her surgery. Dr. Kelly had seen such "idiosyncratic" reactions "several times" in his practice. Moreover, Dr. Kelly opined, it was "virtually impossible" for the positioning of Gubbins's legs during the operation to have caused her nerve complications.

On redirect examination, Dr. Kelly agreed that he had not addressed the cause of Gubbins's nerve damage in any of his patient records or in his EMG report, had not reviewed Gubbins's other medical records, and had received no information concerning the anesthetic and surgical procedures employed in her operation. He did not know how much, or even what, anesthetic Gubbins had been given, where the epidural catheter had been placed, or the position of her legs during the surgery. Asked whether he had talked to anybody about this case, Dr. Kelly disclosed that he had spoken with Dr. Hurson's defense counsel the previous night. By implication, it was in this conversation (the substance of which was not revealed) that Dr. Kelly first expressed his opinions regarding lack of negligence and the idiosyncratic origin of Gubbins's nerve damage.

Appellants' counsel objected to Dr. Kelly's opinion testimony on the grounds that neither side had designated him as an expert opinion witness, his opinions as to causation were outside the scope of direct examination, and "[t]o have him now testify about what he thinks the cause was or was not is a total surprise." According to appellants' counsel, "[Dr. Kelly's] deposition wasn't even taken [in] this case because he hasn't been listed by anybody to do anything other than testify about his [EMG] report." In response, Dr. Hurson's counsel argued that Dr. Kelly's opinions as to causation fit within the scope of direct examination and were admissible because "under the law in this jurisdiction a treating physician can testify about his or her opinions or conclusions that they've reached as a result of their education and experience, and their hands-on involvement with the patient." Defense counsel proffered that Gubbins had testified in her deposition that "Dr. Kelly told her that she had a chemical reaction from the anesthetic agent." Without addressing specifically whether the defense should have designated Dr. Kelly as an expert, the trial court ruled that the defense could elicit his opinions because they were within the scope of his examination on direct.

Dr. Kelly did not state specifically when or for what purpose he formed the opinions about negligence and causation to which he testified on cross-examination. Other than his testimony on redirect, the only testimony bearing on the point came from Gubbins herself. When she consulted Dr. Kelly, Gubbins recalled during her cross-examination, he said that her nerves had been injured by "some medicine during the surgery." Gubbins did not recall his telling her anything else about the cause of her injury.

Whether it was proper for the defendants to elicit Dr. Kelly's opinions as they did depends on whether they fulfilled their pretrial discovery obligations under Rule 26(b)(4) of the Superior Court Rules of Civil Procedure. Rule 26(b)(4) required the defendants to disclose, in their answers

to interrogatories, the relevant "facts known and opinions held" by the expert witnesses whom they expected to call at trial. We do not consider this requirement inapplicable here merely because Dr. Kelly was called to the stand by appellants, and the defendants elicited his challenged opinions on cross-examination without having to call him as a witness themselves. Given the limited scope of Dr. Kelly's direct examination—appellants did not inquire into his opinions on causation or the defendants' possible negligence—it cannot be said that appellants invited or opened the door to such inquiry by the defendants on cross.

■ The pretrial disclosure requirement of Rule 26(b)(4) applies only to facts and opinions that the expert "acquired or developed in anticipation of litigation or for trial." *Id.*; *Adkins v. Morton,* 494 A.2d 652, 657 (D.C.1985) ("[T]he crucial inquiry is whether the facts and opinions possessed by the expert were obtained for the specific purpose of preparing for the litigation in question; if so, Rule 26(b)(4) governs their discovery.") (citations omitted). The Rule imposes no obligation to disclose where the "information was not acquired in preparation for trial but rather because [the expert] was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit." *Adkins,* 494 A.2d at 657 (quoting Fed.R.Civ.P. 26(b)(4) advisory committee note (1970)); *see also Abbey v. Jackson,* 483 A.2d 330, 334–35 (D.C.1984). Thus, Rule 26(b)(4) "focuses not on the status of the witness, but rather on the substance of the testimony." *Patel v. Gayes,* 984 F.2d 214, 218 (7th Cir.1993) (construing former Fed.R.Civ.P. 26(b)(4)).[3]

■ In response to appellants' objection, the defendants in essence contended that Dr. Kelly arrived at his opinions in his role as one of Gubbins's treating physicians. "Insofar as a physician obtains and develops his information and opinions in the course of his treatment of a patient, he becomes an 'actor or viewer' who should be treated as an ordinary witness rather than as an expert covered under Rule 26(b)(4)." *Adkins,* 494 A.2d at 657 (citations omitted). Much of Dr. Kelly's testimony, such as his description of his EMG testing of Gubbins and his diagnosis and prescription, clearly fell within this "exempt-from-Rule 26(b)(4)" category. So, evidently, did Dr. Kelly's opinion, which he expressed to Gubbins while she still was under his care, that her nerves were injured by the medication she received during her surgery.

■ The fact that Dr. Kelly was a treating physician is not the end of the inquiry, however. For purposes of Rule 26(b)(4), a witness "may be an 'expert' as to some matters and an 'actor' as to others." *Patel,* 984 F.2d at 218 (quoting *Nelco Corp. v. Slater Elec., Inc.,* 80 F.R.D. 411, 414 (E.D.N.Y.1978)). Illustratively, in *Patel* the court upheld the exclusion of previously undisclosed opinion testimony by the plaintiff's treating physicians on the standard of care in the community because "their knowledge, in this instance, was not based on their observations during the course of treating his illness." *Id.* "[T]his is 'classic' expert testimony," the court stated, adding that "[a] witness would formulate such an opinion only when preparing for litigation." *Id.*

The question thus remains when Dr. Kelly reached the other expert opinions

---

3. As Superior Court Civil Rule 26(b)(4) was adopted from the Federal Rules of Civil Procedure pursuant to D.C.Code § 11–946 (2001), we construe it "in light of" the corresponding federal rule, taking guidance from both the advisory committee notes to the federal rule and federal court decisions interpreting the rule. *Adkins,* 494 A.2d at 657 n. 5 (quoting *Wallace v. Warehouse Employees Union No. 730,* 482 A.2d 801, 807 (D.C.1984)).

that he expressed on cross-examination: namely, his opinions that Gubbins's adverse reaction to her medication was idiosyncratic and unpredictable; that the injury to her nerves could not have been caused by the positioning of her legs during the operation; and that her adverse reaction and injury did not suggest, and could not be attributed to, any deviation from the standard of care.

It is possible that Dr. Kelly did arrive at such conclusions in the course of examining and treating Gubbins. But the record lends no support to that possibility. If anything, the record casts doubt on it, and suggests that Dr. Kelly reached his conclusions later, while preparing for his trial appearance. Dr. Kelly himself did not testify that he formed his conclusions while he was treating Gubbins, or that he regularly makes causal determinations when seeing patients. *Compare District of Columbia v. Howard,* 588 A.2d 683, 693 (D.C. 1991) (treating physician's expert opinion testimony regarding causation admissible, "as he indicated that he always tried to determine mechanism of injury in the course of treating his patients"). During the entire time he saw Gubbins as his patient, Dr. Kelly admittedly did not review her hospital records, did not know what medicine she had received or how her surgery had been performed, and did not record any opinions as to the cause of her nerve injury. Rather, his EMG report called her condition "peculiar" and its etiology "not at all certain." *Compare Safeway Stores v. Buckmon,* 652 A.2d 597, 606 (D.C.1994) (treating physician's opinion on causation was shown in his contemporaneous treatment reports). So far as appears from the record, Dr. Kelly never expressed the opinions at issue until he conferred with defense counsel on the eve of his trial appearance. He based those opinions, moreover, largely on his education and his experience with patients other than Gubbins.

In short, when challenged, the defendants in this case did not lay the necessary foundation to establish that Dr. Kelly's expert opinion testimony was exempt from the pretrial disclosure requirements of Rule 26(b)(4). It was not enough to show that Dr. Kelly was a treating physician. It was necessary to show that he formulated the opinions in question while he was treating Gubbins. This required showing was not made. Instead, the evidence indicated that Dr. Kelly formulated his key opinions subsequently, in anticipation of his appearance on the witness stand at trial.

▮ Although the point is a subtle one, the trial court committed an error of law in not recognizing that absent the requisite showing, Dr. Kelly's opinion testimony should have been disclosed in advance of trial pursuant to Rule 26(b)(4) notwithstanding his status as a treating physician. As a consequence, the court did not exercise its discretion appropriately when it admitted Dr. Kelly's testimony over appellants' objection. A party seeking to introduce testimony improperly omitted from Rule 26(b)(4) statements "must bear the burden of satisfying a preponderance of" the following factors:

(1) whether allowing the evidence would incurably surprise or prejudice the opposite party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Weiner v. Kneller*, 557 A.2d 1306, 1311–12 (D.C.1989). A trial court weighing these factors must be guided by the "primary purpose" of the discovery rules "to prevent unfair surprise and limit the issues to those articulated before trial, so that an efficient and orderly presentation of evidence may be insured." *Id.* at 1309 (citations omitted); *see, e.g., Haidak v. Corso*, 841 A.2d 316, 326 (D.C.2004).

▮ The defendants did not attempt to demonstrate that the considerations enumerated in *Weiner* weighed in favor of admitting Dr. Kelly's undisclosed opinion testimony, and the trial court did not address those considerations in reaching its decision. As the court thus did not identify and apply the proper criteria, we owe no deference to its determination of the issue. *See Lindy Bros. Builders, Inc. of Philadelphia v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir.1976). In our view, the balance tilts dispositively toward exclusion. Appellants evidently were both surprised and prejudiced by Dr. Kelly's testimony on cross-examination that Gubbins's injury was unpredictable and that no defendant was negligent. This testimony was all the more potent coming, as it did, at the very start of appellants' case-in-chief from one of Gubbins's own treating physicians. Even though appellants themselves called Dr. Kelly, their surprise is understandable, for he had a limited role in treating Gubbins and his report and other medical records did not address the foreseeability of her nerve injuries or the quality of care she had received. Since no party had designated Dr. Kelly as an expert witness, appellants had no reason to prepare to challenge his testimony on such subjects. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757–58 (7th Cir.2004) (listing "countermeasures that could have been taken that are not applicable to fact witnesses, such as attempting to disqualify the expert testimony ..., retaining rebuttal experts, and holding additional depositions to retrieve the information not available because of the absence of a report"). *Compare Abbey*, 483 A.2d at 335 (rejecting parties' claim of unfair surprise with respect to opinions elicited from their own *designated* expert witnesses). No steps were taken at trial to ameliorate the prejudice to appellants. Furthermore, it cannot be said that exclusion of Dr. Kelly's opinion testimony would have been incurably prejudicial to the defendants. The defense called other medical experts who could testify against the "leg positioning" theory of liability, and if those experts could not testify as unequivocally as Dr. Kelly that Gubbins suffered an unpredictable reaction to her anesthetic, they at least suggested that such an (admittedly rare) reaction was possible.

Ultimately, we need not decide whether the error in admitting Dr. Kelly's opinion testimony was sufficiently prejudicial in itself to entitle appellants to a new trial. The error must be considered in conjunction with the trial court's preclusive ruling on *res ipsa loquitur*, to which we now turn.

### B.

▮ On the first day of trial, in ruling on a defense motion *in limine*, the trial court directed that no references be made in opening statements to *res ipsa loquitur*. Apparently surprised by this ruling, appellants' counsel emphasized that the plaintiffs had planned to rely heavily on the *res ipsa loquitur* doctrine, at one point stating "you might as well throw our case out right now." The court subsequently denied appellants' request for a jury instruction on *res ipsa loquitur* on the ground that appellants had not demon-

strated that "the alleged injuries would not ordinarily occur in the absence of negligence." Essentially because we disagree with that assessment of the state of the record, we conclude that the denial of a *res ipsa loquitur* instruction was in error.[4]

 This was a case in which the jury heard a considerable amount of expert medical testimony concerning the standard of care and the genesis of Gubbins's nerve injury.[5] Following Dr. Kelly, whose testimony we have recounted, appellants called Dr. Ferne Severino, a professor of anesthesiology at Yale University School of Medicine. In the opinion of Dr. Severino, Gubbins's nerve injury was attributable to improper anesthetic technique on the part of Dr. Kim. Specifically, Dr. Severino explained, Dr. Kim's incautious administration of a large initial dose of anesthetic during the insertion of her epidural catheter prevented Gubbins from feeling any pain and alerting the anesthesiologist to the fact that the catheter was placed too close to the nerve root (or roots), "in such a way that she could have had an injury related to the medication subsequently administered through the catheter, and perhaps from the catheter itself." Dr. Severino further opined that Gubbins's injury was not attributable to "natural causes" or an "idiosyncratic" or "allergic type reaction" to the medication she received, in part because the "systemic effect" that would be expected from an allergic reaction was absent here. In addition, taking into account that Gubbins's "unusual" injury occurred while she was in the operating room under the sole control of the defendants, it was the opinion of Dr. Severino that Gubbins would not have suffered nerve damage if the standard of care applicable in the field of anesthesiology had been followed.

Dr. William Battle, a general surgeon, also testified on behalf of appellants. Dr. Battle testified that it was a violation of the standard of care for Dr. Hurson to

4. "A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 625 (D.C.1986) (citations omitted). However, the court's decision to issue or refuse to issue instructions should be the result of "an informed choice among permissible alternatives, which is the essence of an appropriate exercise of discretion"; thus, the decision must be "based upon and drawn from a firm factual foundation." *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (citing *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979)). Therefore, a trial court abuses its discretion in fashioning jury instructions when the "stated reasons do not rest upon a [sufficient] factual predicate." *Id.* (brackets in original) (citations omitted).

Furthermore, a party is entitled to an instruction on his or her theory of the case as long as the requested instruction finds support in the evidence. *Id.* (citing *Nimetz v.*

*Cappadona*, 596 A.2d 603, 605 (D.C.1991)). In reviewing the trial court's decision to deny a requested instruction on appellants' theory of the case, we view the evidence in "the light most favorable" to appellants. *Id.* (citing *Wilson v. United States*, 673 A.2d 670, 673 (D.C. 1996)).

5. "In a medical malpractice case, the plaintiff has the burden of proving the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Derzavis v. Bepko*, 766 A.2d 514, 519 (D.C.2000). Expert testimony is required to establish each of these elements unless the "proof is so obvious as to lie within the ken of the average lay juror." *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990) (citations omitted). Typically, when a case "involves the merits and performance of scientific treatment, complex medical procedures, or the exercise of professional skill and judgment, a jury will not be qualified to determine whether there was unskillful or negligent treatment without the aid of expert testimony." *Derzavis*, 766 A.2d at 523.

have kept Gubbins's legs extended under unrelieved stress in the same so-called dorsal lithotomy position for over two hours during her surgery. In Dr. Battle's opinion, Gubbins's traumatic nerve injury occurred either as a result of her leg positioning or (echoing Dr. Severino) as a consequence of the anesthesiologist's faulty technique in inserting the catheter and administering the medication. Like Dr. Severino, Dr. Battle rejected the possibility that Gubbins's injury was attributable to "natural causes," such as "patient variability or sensitivity." Also like Dr. Severino, Dr. Battle opined that the injury could not have occurred absent negligence in the operating room, when Gubbins was under the defendants' exclusive control.

Dr. Kim denied that his anesthetic technique was improper, insisting (contrary to Dr. Severino's opinion) that he had used a small test dose of anesthetic before administering the larger dosage to Gubbins. Dr. Hurson similarly denied that she had positioned Gubbins improperly. The defendants' medical experts undertook to rebut appellants' specific negligence claims against Dr. Kim and Dr. Hurson, The defendants and their experts did not deny, however, that the nerve injury Gubbins sustained ordinarily would not have occurred absent medical negligence of some kind in the operating room. With one partial exception, moreover, no defense witness professed to be able to explain how Gubbins was injured or to rule out negligence as the probable cause. Thus, Drs. Kim and Hurson offered no opinions on those questions. Dr. John Cochran, a neurologist on the faculty of Georgetown University Hospital, was firm in his opinion that Gubbins's nerve damage was not attributable to her positioning during the surgery, but he expressed no opinion on whether the damage was attributable to Dr. Kim's anesthetic technique, and he admitted that he did not know what hap-

pened to Gubbins to cause her injury. While Dr. Cochran acknowledged that "idiosyncratic—meaning unusual—reactions" to anesthetic drugs "could cause irritations to nerves," permanent damage from such reactions rarely had been reported ("one time in like 10,000 or 8,000 or something"), and he himself had never seen it. Dr. Cochran did not draw any conclusion that Gubbins had suffered such an unpredictable reaction.

Dr. Norman Armstrong, an expert in obstetrics and gynecology, similarly testified that Gubbins was "positioned perfectly" but did not address the administration of her anesthesia and had no opinion as to what did cause the harm that befell her. Dr. Charise Petrovitch, an anesthesiologist, defended Dr. Kim's anesthetic technique and opined that it could not have injured Gubbins, but she too had no explanation for Gubbins's nerve damage.

The one defense expert witness who did venture anything like an explanation was Gubbins's principal treating neurologist, Dr. Anderson. Rejecting the "positioning" theory, Dr. Anderson stated "there was some type of chemical problem or sensitivity that was probably the cause" of Gubbins's nerve injury. Dr. Anderson then agreed with defense counsel that "more likely than not ... Ms. Gubbins may have experienced this difficulty because of an unusual sensitivity to the usual medications that are given as part of an epidural anesthetic." Dr. Anderson apparently was not committed to "unusual sensitivity" as the sole explanation, however, for he subsequently characterized the triggering event as "something that ... could have insulted her nerves and caused a reaction, *either due to its direct effect or causing a hypersensitivity on her part to take place.*" (Emphasis added.) In the end, therefore, Dr. Anderson's opinion was seemingly consistent with the explanation espoused by

Dr. Severino, that negligent administration of the anesthetic by Dr. Kim caused Gubbins's nerve injury. Significantly, Dr. Anderson was not asked about Dr. Severino's explanation, and he did not address the plausibility of the "anesthetic technique" scenario.

The doctrine of *res ipsa loquitur* applies in a medical malpractice case when the adverse consequences of the medical procedure "(1) ordinarily do not occur in the absence of negligence, (2) are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) are not due to any voluntary action or contribution on the part of the plaintiff." *Quin v. George Wash. Univ.,* 407 A.2d 580, 583 (D.C.1979) (footnote and citation omitted). When these requirements are proved by a preponderance of the evidence, the doctrine permits the jury to infer negligence from the mere occurrence of the patient's injury:

> [T]he happening itself affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.... When properly invoked in a medical malpractice case, *res ipsa loquitur* supplies evidence that the defendant physician failed to meet the requisite standards of care and skill.... The doctrine, therefore, helps the plaintiff overcome two difficulties often encountered in medical malpractice cases: (1) inability to obtain favorable expert testimony and (2) inability to explain the events causing injury, and prove specific acts of negligence by the defendant-doctor.

*Id.* at 582 (internal quotation marks and citations omitted).[6]

*Res ipsa loquitur* is not to be invoked lightly in any case, and particularly not where medical malpractice is claimed, for "despite all precautions and skill, [complications do] sometimes follow accepted and standard medical treatment." *Id.* at 583 (quoting *Quick v. Thurston,* 110 U.S.App.D.C. 169, 172–73, 290 F.2d 360, 363 (1961) (en banc)). "There must be a basis in the record or in common experience to warrant the inference." *Id.* Typically, therefore, the plaintiff must present expert testimony "that the injury does not ordinarily occur unless caused by negligence." *Id.* at 583–84. " '[O]rdinarily' is the key concept of *res ipsa loquitur.*" *Id.* at 583 (citation omitted); *accord, Derzavis,* 766 A.2d at 523 (requiring "at least ... some expert opinion that the event will not usually occur if due care is used"). Otherwise put, "the evidence must make plaintiff's theory [of negligent causation] reasonably probable, not merely possible, and more probable than any other theory based on the evidence." *Quin,* 407 A.2d at 585.

In the case at bar, Drs. Severino and Battle testified that if the defendants had adhered to the standard of care in the operating room, while Gubbins was under their exclusive control, she would not have suffered nerve damage. With this expert opinion testimony, appellants satisfied the threshold requirement for obtaining an instruction on *res ipsa loquitur.* We explained in *Quin,* however, that while such expert testimony is necessary, it is not always sufficient to entitle the plaintiff to invoke the doctrine. When the parties present "conflicting medical testimony" that "indicates a lack of consensus in the medical field as to the cause of [the injury] following [the medical treatment], despite

6. *See* Standardized Civil Jury Instructions for the District of Columbia, Instruction No. 5.11 ("Res Ipsa Loquitur") (2002 Rev. Ed.).

agreement that such [a result] is a rarity," the trial court properly may refuse the instruction. *Id.* at 584. The plaintiff has a right to a *res ipsa loquitur* instruction only when "it is a matter of common knowledge among laymen or medical men or both that the injury would not have occurred without negligence." *Id.* (quoting *Salgo v. Stanford Univ. Bd. of Trs.*, 154 Cal.App.2d 560, 317 P.2d 170 (1957)). Thus we have said that although conflicting expert testimony does not in itself render the doctrine inapplicable, a trial court properly may refuse to instruct on *res ipsa loquitur* if it finds that "two equally plausible conclusions" as to the presence or absence of negligence are deducible from the testimony *in toto*. *Wash. Metro. Area Transit Auth. v. L'Enfant Plaza Props., Inc.*, 448 A.2d 864, 868 (D.C.1982); *Quin*, 407 A.2d at 584 (equally plausible that hemorrhaging arose from natural causes as that it resulted from improper ligation by surgeons; *held*, instruction on *res ipsa loquitur* was properly denied); *see also Foster v. George Washington Univ. Med. Ctr.*, 738 A.2d 791, 798 (D.C.1999).

■ The disagreements among the expert witnesses in this case over appellants' specific theories of negligence did not establish a lack of medical consensus on the question whether Gubbins's nerve injury most probably was caused by negligence of some kind on the part of the physicians attending her in the operating room. Other than Dr. Kelly, whose testimony on this question must be disregarded because it should not have been admitted over appellants' objection, no expert disputed the testimony of Drs. Severino and Battle that the injury Gubbins received ordinarily does not occur absent medical negligence. Indeed, except for Dr. Anderson, no defense expert was prepared to suggest a non-negligent cause of the injury, and Dr. Anderson's suggestion of such a cause was

equivocal: his belief that Gubbins had an adverse reaction to her anesthetic was consistent with the theory of negligence advanced by Dr. Severino, which he never disputed, and ultimately the "hypersensitivity" Dr. Anderson mentioned was no more than an alternative possibility. It was a possibility, moreover, that was not independently substantiated; even though such hypersensitivity was admittedly rare, the defense presented no test results or other evidence that Gubbins in fact was unusually allergic or sensitive to the anesthetic used in her operation. In our view, the undeveloped evidence that Gubbins's nerve injury *could have been* an idiosyncratic, unpredictable and uncommon drug reaction fell short of rebutting the expert testimony that such an injury *ordinarily* does not occur in the absence of negligence. In other words, no "equally plausible" alternative to negligence was shown.

■ We see no other justification for denying appellants' request for a *res ipsa loquitur* instruction. Appellees argue that the doctrine is intended merely to assist the plaintiff who cannot explain the events causing injury, which was unnecessary here, where specific allegations of negligence were made. The argument is not well taken. "This court permits the plaintiff in a proper case to rely upon both *res ipsa loquitur* and proof of specific acts of negligence.... Though *some* evidence may tend to show the specific cause of an accident, a plaintiff should not be deprived of the benefit of the doctrine if after his case in chief is in, the true cause is still left in doubt or is not clearly shown." *Quin*, 407 A.2d at 582–83 (internal citations omitted). *Res ipsa loquitur* becomes irrelevant only when the manner in which the defendant was allegedly negligent is "completely elucidated," *Otis Elevator Co. v. Henderson*, 514 A.2d 784, 786 (D.C.1986) (quoting *Loketch v. Capital Transit Co.*,

101 U.S.App. D.C. 287, 288, 248 F.2d 609, 610 (1957)), and "there is nothing left for the jury to infer regarding the cause of the accident." *Sullivan v. Snyder*, 374 A.2d 866, 867 (D.C.1977).

Finally, while Dr. Hurson, Dr. Kim and the Hospital staff supporting them had different roles in the operating room, they were working together to carry out Gubbins's operation, during which she was in their exclusive control. "It is not necessary for the applicability of the *res ipsa loquitur* doctrine that there be but a single person in control of that which caused the damage.... The doctrine may apply against two defendants if there is joint control and in a proper case it is for the jury to say whether either or both had control." *Greet v. Otis Elevator Co.*, 187 A.2d 896, 898 (D.C.1963) (internal quotation marks and citation omitted).

We conclude that the trial court erred in rejecting appellants' request for a *res ipsa loquitur* instruction. As with the erroneous admission of the expert opinion testimony of Dr. Kelly, we need not assess the impact of the error in isolation. Viewing them in combination, we cannot find the two errors to have been harmless. *See Nelson*, 694 A.2d at 902 (holding that trial court's erroneous refusal to instruct jury on one of plaintiff's theories of liability in medical malpractice case was substantially prejudicial). If the jury had not heard Dr. Kelly's testimony, which uniquely and effectively undermined appellants' theory of negligent causation, and if it then had been instructed on *res ipsa loquitur*, we think it might well have found some or all of the defendants liable, even if it still might have rejected appellants' specific claims of negligence; moreover, had the court's two rulings been different, we think the jury might well have considered appellants' specific negligence claims against Dr. Kim

and Dr. Hurson in a different and more favorable light.

Accordingly, we reverse the judgment of the trial court and remand for a new trial.