DRS. GROOVER, CHRISTIE &
MERRITT, P.C., and William
L. Higgins, M.D., Appellants,

v.

Sharon K. BURKE, Appellee.

Nos. 04–CV–1115, 04–CV–1116,
05–CV–545, 05–CV–546.

District of Columbia Court of Appeals.

Argued Oct. 26, 2006.
Decided March 8, 2007.

Alfred F. Belcuore, Washington, for appellants.

Patrick A. Malone, with whom Raymond B. Herschthal was on the brief, Washington, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and NEBEKER, Senior Judge.

GLICKMAN, Associate Judge:

▉ This is an appeal by Drs. Groover, Christie and Merritt, P.C. ("GCM"), and William L. Higgins, M.D., from an adverse judgment in a medical malpractice action brought by Sharon K. Burke. The two main issues are whether the trial court should have excluded expert testimony of a GCM radiologist because Ms. Burke did not designate him as an expert witness in pretrial discovery, and whether the court should have applied Maryland law to cap the award of non-economic damages.[1] We conclude that only the latter claim entitles appellants to relief.

## I. Factual Background

In December 1999, Sharon Burke, a forty-year-old citizen of Maryland, began experiencing dizziness and numbness in her arms and legs. Ms. Burke consulted Dr. Stuart Goodman, a neurologist in Clinton, Maryland. Dr. Goodman ordered magnetic resonance imaging (MRI) studies of Ms. Burke's brain. Dr. Gary Staples, a GCM radiologist in Clinton who wrote the report interpreting the MRI films, identified multiple sclerosis as the most likely diagnosis.

Ms. Burke's condition did not improve. She returned to Dr. Goodman in July 2000,

---

1. We summarily reject appellants' claim that the trial court erred when it refused to reduce the amount of the judgment against them after Ms. Burke settled with their co-defendant, Dr. Goodman. It is true that "where a plaintiff settles with one joint tortfeasor whose liability is judicially established, a nonsettling tortfeasor is entitled to a pro rata reduction of a jury verdict for the plaintiff." *District of Columbia v. Shannon*, 696 A.2d 1359, 1366 (D.C.1997). However, Ms. Burke denies that she has settled with Dr. Goodman, and the record does not show that she has. In lieu of taking an appeal, Dr. Goodman has paid Ms. Burke the total amount of his malpractice insurance coverage in partial satisfaction of his *pro rata* share of the judgment, and Ms. Burke is seeking to recover the entire balance from appellants. Nonetheless, so far as appears, Ms. Burke has not released Dr. Goodman from his joint liability for the balance of the award or otherwise compromised appellants' ability to seek contribution from him.

complaining of severe headaches in addition to the continuing numbness in her limbs. Dr. Goodman ordered a second MRI scan to be performed by GCM. This time the scan was analyzed by Dr. William Higgins, another GCM radiologist. Dr. Higgins's report, which was co-signed by Dr. Staples, again identified multiple sclerosis as the most likely explanation for Ms. Burke's problems. The report did not mention that the July MRI scan revealed evidence of blockage in Ms. Burke's right carotid artery, which placed her at high risk of a stroke. According to his subsequent testimony, Dr. Higgins attributed the evidence of blockage to "turbulent flow" in the artery and dismissed it as "artifactual." Dr. Higgins reached that conclusion without ordering confirmatory tests or comparing the July scan to the December scan.

Over the next several weeks, Ms. Burke reported to Dr. Goodman that she had begun slurring her speech and having memory problems. Dr. Goodman told Ms. Burke that the two MRI scans indicated that she might have multiple sclerosis. Although he ordered additional tests to rule out arthritis, Lyme disease, and other potential diagnoses, Dr. Goodman did not suspect that Ms. Burke was suffering the effects of arterial blood clots.

On September 18, 2000, at the suggestion of her mother, Ms. Burke sought a second opinion from Dr. David Moore, a neurologist in the District of Columbia. After reading Ms. Burke's two MRI reports, which GCM faxed to him, Dr. Moore told her that she potentially had multiple sclerosis. Dr. Moore asked to see Ms. Burke's MRI films, which Ms. Burke's mother obtained from GCM and personally delivered to Dr. Moore the following day.

A few days before Ms. Burke's next scheduled appointment with him on October 18, 2000, Dr. Moore asked a radiologist at the Washington Hospital Center to help him interpret her MRI results. The radiologist told him that the July scan indicated a possible blockage of the right carotid artery. Consequently, Dr. Moore told Ms. Burke on October 18 that the scan showed signs of "mini strokes." Believing, however, that Ms. Burke was not in imminent danger because her symptoms had not worsened, Dr. Moore did not prescribe anti-clotting medication or other preventive measures. Instead, he ordered ultrasound imaging of Ms. Burke's carotid arteries and other tests to determine her risk of suffering further strokes.

On the morning of October 23, 2000, the day the additional tests were to be conducted, Ms. Burke suffered a massive stroke at her home in Maryland. She was treated at Prince George's County Hospital, where doctors determined that the stroke was caused by clots in her right carotid artery that likely had formed over a period of several months. Ms. Burke subsequently was transferred to the National Rehabilitation Hospital in the District of Columbia for intensive stroke rehabilitation and then to Washington Hospital Center for treatment of blood clots in her leg and a hysterectomy. Ms. Burke suffered severe and permanent cognitive and physical impairments as a result of her stroke.

In December 2001, Ms. Burke commenced a medical malpractice action in Superior Court against Dr. Moore and his employer, the Neurology Center, P.A. Ms. Burke thereafter filed a separate malpractice action in Superior Court against Dr. Goodman, Dr. Higgins, and GCM. (Ms. Burke sought to hold the Neurology Center and GCM vicariously liable for the negligence of their employees.) The two actions, which were consolidated, went to trial in March 2004. The jury exonerated Dr. Moore but found Dr. Goodman and appellants jointly and severally liable for

malpractice in failing to diagnose and treat the blockage in Ms. Burke's right carotid artery before she suffered her disabling stroke. The jury awarded nearly $5.8 million in damages, including $2 million for Ms. Burke's "non-economic" losses.[2] The trial court denied appellants' post-trial motions, including their request that the non-economic damages be reduced in accordance with Maryland law, and this appeal followed.

## II. Dr. Staples's Expert Testimony

Appellants assert that the trial court abused its discretion by admitting over objection certain expert testimony of Dr. Staples despite Ms. Burke's failure to designate him as an expert witness in pretrial discovery. Appellants argue that the court's error warrants a new trial. We disagree.

### A. Background

Prior to trial, Ms. Burke deposed Dr. Staples regarding Dr. Higgins's July 2000 MRI report. Dr. Staples testified that he himself had signed the report only as a proofreader, and that he had not personally reviewed or interpreted the July films. Upon then being shown those films at the deposition, Dr. Staples said that Ms. Burke's right internal carotid artery appeared to be "blocked or occluded," with "ischemia of brain supplied by the artery." Asked to compare the July scan with the December scan, Dr. Staples saw "areas of probably [sic] infarction in the brain." Ms. Burke designated this deposition testimony in the parties' joint pretrial statement as evidence she intended to offer at trial. In that same statement, appellants listed Dr. Staples as a defense witness and

objected to the introduction of his deposition testimony solely on the ground that it would be "cumulative of testimony provided in open court."

At trial, Ms. Burke called Dr. Staples as a witness in her case-in-chief. Before Dr. Staples took the stand, appellants' counsel objected to Ms. Burke's attempt "to use Dr. Staples as an expert witness by getting him to compare [MRI] films that he did not read officially." In the ensuing colloquy, Ms. Burke's counsel represented that he would ask Dr. Staples, "what did you see when you looked at the July film, what did you see when you looked at the December film?" Appellants' counsel said "that's fine," and the objection appeared to be resolved. When Ms. Burke's counsel thereafter asked him about the July 2000 MRI scan, Dr. Staples testified without objection that "it looked like there was some abnormal signal in the right internal carotid artery which may be due to narrowing or decreased altered flow. And it would make me wonder about ischemia in the brain." Dr. Staples also acknowledged having stated at his deposition that the findings were "suspicious for an occlusion of the internal carotid artery on the right with subsequent ischemia of brain supplied by that artery."

Ms. Burke's counsel then asked Dr. Staples for his "global view" of Ms. Burke's condition, "putting together" the December and July MRI studies. At that point, appellants' counsel objected that the question impermissibly called for expert witness testimony, given that Dr. Staples first compared the two sets of films at his deposition and not as part of his "doctor-patient relationship" with Ms. Burke.[3] Ms. Burke's counsel responded that Dr. Good-

**2.** The verdict form stated that non-economic losses included "the effects any physical injuries have on the overall physical and emotional well-being of the plaintiff, physical pain, emotional distress, inconvenience, physical impairment [and] mental impairment."

**3.** "This doctor," appellants' counsel elaborated, "wasn't a factual participant because [Ms. Burke's counsel] asked him the question at the deposition and he did not compare the two previously.... He did it not as a factual

man would testify that he had discussed the MRI results with Dr. Staples in July 2000 (which Dr. Staples did not recall doing). The court instructed Ms. Burke's counsel to frame the question differently, and he then asked Dr. Staples what he would have told Dr. Goodman, hypothetically speaking, if they had discussed how the December and July films "looked side by side." Appellants' objection was overruled and Dr. Staples answered that he would have told Dr. Goodman what he said at his deposition, namely, that Ms. Burke's brain tissue was "probably" infarcted in certain areas due to blood clots or arterial blockage. Had Dr. Goodman sought his recommendation, Dr. Staples continued, he would have called for additional tests "to see if it really was an occlusion or just an area of turbulence or [if there was] some other reason for [the] decreased or abnormal signal in that carotid artery," and also "to find out what these peripheral brain lesions were." Dr. Staples conceded that it would be important to find out whether there was an occlusion because "it could possibly cause her further stroke[s]." [4]

## B. The Discovery Violation and Its Significance

■ Rule 26 (b)(4) of the Superior Court Rules of Civil Procedure requires parties "to disclose, in their answers to interrogatories, the relevant 'facts known and opinions held' by the expert witnesses" whom they expect to call at trial. *Gubbins v. Hurson,* 885 A.2d 269, 276–77 (D.C.2005). "The pretrial disclosure re-

quirement of Rule 26(b)(4) applies only to facts and opinions that the expert 'acquired or developed in anticipation of litigation or for trial.'" *Id.* at 277 (citing *Adkins v. Morton,* 494 A.2d 652, 657 (D.C. 1985)). "The Rule imposes no obligation to disclose where the 'information was not acquired in preparation for trial but rather because [the expert] was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit.'" *Id.* (citations omitted).

While Ms. Burke did not list Dr. Staples by name in her Rule 26(b)(4) statement, she did "reserve[ ] the right to seek expert testimony from any health care provider identified in [her] medical records," which implicitly included Dr. Staples. Even so, however, the statement did not disclose the substance of Dr. Staples's anticipated expert testimony; in particular, the statement did not mention the opinions Dr. Staples expressed at trial when he was asked to compare the December and July MRI scans. Appellants argue, and it appears uncontested, that Dr. Staples formulated those opinions in anticipation of trial and not while acting as Ms. Burke's radiologist or Dr. Goodman's consultant, because the first time Dr. Staples remembered comparing the two scans was at his deposition. Thus, though "the point is a subtle one," in admitting Dr. Staples's comparison testimony without recognizing that its substance should have been disclosed in Ms. Burke's Rule 26(b)(4) statement, the trial court may have committed an error of law. [5] *See Gubbins,* 885 A.2d at 278.

---

participant, but at the request of counsel in the deposition."

4. Dr. Goodman testified that Dr. Staples— whom he had known for several years and whose office was in his building—spoke with him about the July MRI scan on July 28, 2000. According to Dr. Goodman, they discussed the fact that the scan "did not appear to be typical for multiple sclerosis" and that it

appeared to be more typical of vasculitis or inflammation of blood vessels.

5. The court made no predicate finding that Dr. Staples actually did compare the MRI films prior to his deposition, nor did the court purport to exercise its discretion to excuse Ms. Burke's noncompliance with Rule 26(b)(4). *See Weiner v. Kneller,* 557 A.2d 1306, 1311–12 (D.C.1989) (enumerating rele-

■ Nonetheless, the primary purpose of Rule 26(b)(4) is to prevent unfair surprise and concomitant prejudice. *See Gubbins,* 885 A.2d at 279. Although appellants contend otherwise, Dr. Staples's comparison testimony neither surprised nor materially prejudiced them. Since Dr. Staples had signed the July 2000 MRI report, and Dr. Goodman recalled reviewing the July films with him, it was entirely predictable that he would be asked about the significance of those films in light of the earlier MRI scan that he himself had interpreted. More important, Dr. Staples's comparison testimony merely reiterated what he previously had said at his deposition. Not only were appellants well aware of the deposition testimony, but also Ms. Burke specifically designated it as potential evidence in the parties' joint pretrial statement. Having objected to the deposition testimony then only on the ground that it would be "cumulative of testimony provided in open court," appellants are in no position to complain that Dr. Staples's testimony in open court surprised them. Their objection implies that they expected him to testify as he did. In point of fact, moreover, his comparison testimony added little of consequence to Dr. Staples's interpretations of the December and July MRI scans individually (to which appellants did not object at trial),

and it was replicated by the other medical experts who testified at trial.

Given the absence of surprise and unfair prejudice, we conclude that Ms. Burke's presumed violation of Rule 26(b)(4) does not entitle appellants to a new trial. *See R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 540 (D.C.1991) (adopting harmless error requirement for appellate review in civil cases).

### III.  Choice of Law

We turn to appellants' claim that the trial court should have reduced the jury's award of $2 million for pain and suffering and other non-pecuniary losses by applying the law of Maryland, which imposes a statutory ceiling on so-called non-economic damages in personal injury actions. *See* MD.CODE ANN., CTS. & JUD. PROC. § 11–108 (2006). If Maryland law applies, the statute would cap Ms. Burke's non-economic damages at $590,000. *See id.* § 11–108(b). District of Columbia law, in contrast, imposes no limitation on such damages.[6]

■ Appellants urged the trial court to apply the law of Maryland because their negligent conduct and Ms. Burke's injury occurred in Maryland and the parties' relationship was centered there, among other relevant factors. Although the court agreed that Maryland's interests were

---

vant factors the court should address on the record).

In *Abbey v. Jackson,* 483 A.2d 330 (D.C. 1984), we questioned whether a party needs to list an opposing party (or the opposing party's own designated experts) in her Rule 26(b)(4) statement. Requiring their listing "appears incongruous," we observed, because the opposing party already "knows his own background and opinion, as well as those of his own [expert] witnesses." *Id.* at 335. Ms. Burke's counsel has cited this *dicta* to us; arguably, it is applicable here even though Dr. Staples was not a party defendant because the jury could have found GCM vicariously

liable for his negligence. However, in view of our disposition of appellants' claim on other grounds, we find it unnecessary to decide whether Dr. Staples's "quasi-party" status excused Ms. Burke from having to disclose his anticipated expert testimony in her Rule 26(b)(4) statement.

6.  It should be noted that, though Ms. Burke opposed the application of Maryland's statutory cap to the judgment against appellants, she agreed that Maryland law applied with respect to Dr. Goodman. The difference, it appears, is that Dr. Goodman concededly had no meaningful association with the District of Columbia.

"strongly implicated," it denied appellants' request. Citing the facts that: (1) GCM has offices in the District of Columbia and provides radiology services at District hospitals; (2) Ms. Burke obtained medical treatment for her stroke in the District; and (3) Dr. Higgins (or GCM) sent Ms. Burke's MRI reports to Dr. Moore in the District for his review, the court found "a sufficient factual nexus" with the District to "allow for application of District of Columbia law." Our review of this choice of law ruling is *de novo*. *See, e.g., Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C.1989); *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006).

## A. Governing Legal Principles

■ We have summarized our approach to choice of law questions in tort cases as follows:

In determining which jurisdiction's law to apply in a tort case, we use the "governmental interests" analysis, under which we evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review. As part of this analysis, we also consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145:

a) the place where the injury occurred;

b) the place where the conduct causing the injury occurred;

c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

d) the place where the relationship is centered.

*District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C.1995) (citations omitted). The Restatement factors help to identify the jurisdiction with the " 'most significant relationship' to the dispute," that presumptively being the jurisdiction whose policy would be more advanced by application of its law. *Hercules*, 566 A.2d at 41 & n. 18 (citations omitted). "When both jurisdictions have an interest in applying their own laws to the facts of the case, 'the forum law will be applied unless the foreign [jurisdiction] has a greater interest in the controversy.' " *Coleman*, 667 A.2d at 816 (quoting *Kaiser–Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C.1985)).

## B. The Jurisdictional Interests in the Present Controversy

■ Each of the four Restatement factors points to Maryland as the jurisdiction with the most significant relationship to this case. The "place where the injury occurred" was Maryland—that is where Ms. Burke suffered her stroke. The "place where the [culpable] conduct causing the injury occurred" also was Maryland—that is where Dr. Higgins misread Ms. Burke's July 2000 MRI scan and wrote his misleading report, and that also is where Dr. Goodman failed to recognize the danger of a stroke and treat the blockage in Ms. Burke's carotid artery. As to the third Restatement factor, Ms. Burke lived and was employed in Maryland; GCM was incorporated there; and Dr. Higgins, Dr. Staples and Dr. Goodman all worked in Maryland. Finally, the parties' relationship was "centered" in Maryland—that is where Ms. Burke consulted with Dr. Goodman and where each of her MRI scans was conducted.

The facts on which the trial court based its finding of a "nexus" with the District of Columbia are all of lesser significance in our view. GCM's activities in the District had nothing to do with the tortious conduct at issue in this lawsuit, and if the District developed an interest in that tortious conduct because Ms. Burke subsequently

chose to seek medical treatment for her stroke in this jurisdiction, it was an attenuated interest at best. Ms. Burke emphasizes the third fact cited by the trial court-GCM's transmission of her MRI reports into the District to Dr. Moore. If Dr. Moore had received a report identifying the blockage in her carotid artery, Ms. Burke contends, Dr. Moore would have prescribed medication or taken other measures to prevent her stroke. That may be so, but Ms. Burke's argument only underscores the fact that the central act of negligence, from which all of her damages stemmed, was Dr. Higgins's misreading of the July 2000 MRI scan, which occurred in Maryland. Moreover, GCM's provision of the July MRI report to Dr. Moore was not the sole, or even main, causal link between Dr. Higgins's negligence and Ms. Burke's injuries, for if the report misled Dr. Moore, it also misled Dr. Goodman. Had the report identified the carotid artery occlusion, presumably Dr. Goodman too would have treated Ms. Burke prophylactically (in which case she never would have consulted Dr. Moore). Finally, this was not a situation in which the MRI report was prepared for a physician in the District; it was prepared for Dr. Goodman in Maryland. Ms. Burke's subsequent decision to involve Dr. Moore was unilateral, after-the-fact, and not within appellants' contemplation. We therefore think that GCM's ministerial act of transmitting the previously prepared reports to Dr. Moore was not enough to establish a significant relationship between the District and Ms. Burke's case against appellants; the District's connection with that case was incidental at best.

Thus, we conclude that Maryland has the more significant relationship to this dispute. As a rule, "the state with the most significant relationship should also be the state whose policy is advanced by application of [its] law." *Hercules*, 566 A.2d at 41 n. 18 (internal quotation marks and citation omitted). *See, e.g., Bledsoe v. Crowley*, 270 U.S.App. D.C. 308, 311–12, 849 F.2d 639, 642–43 (1988) (holding, in a medical malpractice action, that "[w]here the entire relationship between the parties was centered in Maryland and the allegedly tortious conduct occurred in that state, Maryland's interest in regulating the activity must be deemed the stronger one"); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. e(1971). We conclude that Maryland does, indeed, have an interest in this case that outweighs any interests of the District.

■ The Court of Appeals of Maryland has explained that the State's statutory cap on non-economic damages

> was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. This crisis resulted in the unavailability of liability insurance for some individuals and entities, especially those engaged in hazardous activities such as asbestos removal, and increasing difficulty in obtaining reinsurance. The crisis also affected the medical profession,· resulting in excessive insurance premiums for doctors and declining services for patients, especially in high risk specialties such as obstetrics.

*Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102, 114–15 (1992) (citations omitted). Thus, the Court of Appeals apprehended, "[t]he General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public." *Id.* at 115. Given that the instant case involves a personal injury claim asserted by a Maryland resident against Maryland doctors on account of medical services rendered in Maryland, the public policy underlying Maryland's statutory cap is directly implicated and would be advanced by applying the Maryland law.

For the same reason, the District of Columbia has no comparable interest in this dispute. *See Dunkwu v. Neville,* 575 A.2d 293, 296 (D.C.1990) ("[I]n this suit between a Virginia resident and a Virginia health care provider arising strictly from events in Virginia, it seems obvious that Virginia's governmental interest in capping liability for malpractice would outweigh the District's competing interest for choice of law purposes."). Our opinion in *Stutsman, supra,* is not to the contrary. In that case, it is true, we declined to apply Virginia's statutory cap on malpractice damages even though the plaintiff there was a Virginia resident and the alleged malpractice had occurred in Virginia. But the District of Columbia had two interests at stake in *Stutsman* that it does not have in the present case. First, unlike in this case, the defendants in *Stutsman* were District of Columbia corporations, and we found that the District had a "significant interest ... in holding *its* corporations liable for the full extent of the negligence attributable to them." 491 A.2d at 509–10 (emphasis added). (Conversely, we perceived Virginia's countervailing interest in applying its damages cap to be correspondingly "attenuated" because the defendants were "foreign corporations with principal places of business outside the State." *Id.* at 511.) Second, and also unlike in this case, the plaintiff in *Stutsman* was employed in the District, and we found that the District had "an interest in protecting a member of its work force who contracts for health services with a District of Columbia corporation within this forum and then is injured by the negligence of that corporation's agents." *Id.* at 510. While these considerations led us to conclude that the District had a substantial, overriding interest in the *Stutsman* litigation, they are absent here; accordingly, "none of these factors would point to a stronger interest for the District of Columbia" in the present case. *Bledsoe,* 270 U.S.App. D.C. at 312 n. 6, 849 F.2d at 643 n. 6.

Ms. Burke argues that the District has a governmental interest in deterring foreign corporations from "carelessly disseminating wrong medical information to District doctors who rely on that information." Perhaps so; but as Maryland law does not prevent a defendant from being adjudged liable for substantial damages, its application does not undermine the District's deterrence interest in any material sense.

We conclude that Maryland has a greater interest in applying its statutory cap on non-economic damages to this controversy than the District has in applying no limitation on damages. Accordingly, while we do not grant appellants a new trial, we remand this case for the trial court to amend the judgment by reducing the non-economic damages portion of the jury's award to the maximum allowed under Maryland law.

*So ordered.*